**AGRASHELL, INC., Appellant,**

v.

**HAMMONS PRODUCTS COMPANY,**
**Appellee.**

**No. 71–1538.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 15, 1972.

Decided March 30, 1973.

Rehearing Denied May 1, 1973.

Albert C. Johnston, New York City, for appellant.

John C. Scott, Washington, D. C., for appellee.

Before ROSS and STEPHENSON, Circuit Judges, and URBOM, Chief District Judge.

ROSS, Circuit Judge.

Agrashell, Inc. (Agrashell) appeals from a judgment entered on a jury verdict in favor of Hammons Products Company (Hammons), on a counterclaim filed by Hammons in a patent infringement suit alleging violations of sections 1 and 2 of the Sherman Act and requesting treble damages under the Clayton Act. For reasons hereinafter set forth,

we reverse in part and affirm in part the judgment of the trial court and order the dismissal of that portion of the counterclaim alleging violations of section 2 of the Sherman Act.

*Procedural History*

Agrashell instituted a patent infringement action against Hammons in 1963. The trial court granted Hammons a summary judgment because it found that Agrashell, as an exclusive licensee, did not have a right to sue for patent infringement in its own name without participation of the patent owner as party-plaintiff. Agrashell, Inc. v. Hammons Products Co., 248 F.Supp. 258, 260 (W.D.Mo.1965), aff'd, 352 F.2d 443 (8th Cir. 1965).

Although the patent expired in 1964, Agrashell obtained an assignment of title to the patent and refiled the action in 1965 for past infringement. These proceedings were stayed pending the outcome of the appeal from the 1963 summary judgment. Thereafter, Hammons filed an answer and counterclaim charging violations of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1–2) and for a declaratory judgment of patent invalidity, unenforceability and non-infringement. The case was then set for trial.

A motion, made by Agrashell at the outset of the 1967 infringement trial, to sever the antitrust counterclaim issue from the patent issue was granted at the conclusion of the patent infringement portion of the case. On the patent claim the trial court entered judgment for Hammons, finding the patent invalid and not infringed either directly or contributorily. The court also found that even if the method claim were valid, it was not infringed by Hammons. Agrashell, Inc. v. Hammons Products Co., 279 F.Supp. 522 (W.D.Mo.1967), aff'd, 413 F.2d 89 (8th Cir. 1969). The court, however, denied Hammons' request for attorneys' fees pursuant to 35 U.S.C. § 285.

Immediately following the trial of the patent issue, both parties conducted discovery relating to Hammons' antitrust counterclaim, and Hammons requested a jury trial. Agrashell then requested leave of the court to file an amended reply and counter-counterclaims for breach of contract and antitrust violations. Agrashell alleged that Hammons had violated sections 1 and 2 of the Sherman Act, section 7 of the Clayton Act (15 U.S.C. § 18), and the Robinson-Patman Act (15 U.S.C. § 13). Both requests were granted and the case proceeded to trial in 1970.

At the outset of the 1970 trial Hammons moved for trial of its counterclaim separate from trial of Agrashell's counter-counterclaim. The trial court decided that each case would be presented separately but to the same jury. However, five weeks later, at the close of all of the evidence on Hammons' counterclaim, the motion for severance was granted over Agrashell's objection, Agrashell's motions for a directed verdict were denied,[1] and a verdict was returned by the jury in favor of Hammons. Thereafter, pursuant to a stipulation of the parties, Agrashell's counter-counterclaims were dismissed without prejudice. Agrashell's motions for judgment n. o. v. or for a new trial were denied, and this appeal was taken.

*Statement of Facts*

*A. The Product*

This case involves the use of processed nutshells in two ways: First, as a soft grit abrasive (SGA) in cleaning operations, and secondly, as lost circulation material (LCM) used in oil well drilling.

SGA is "soft" in relation to harder abrasives such as sand. For example, SGA is projected against deposits on engine parts by air blasting and other

---

[1]. At the same time, however, the trial court noted that it refused to submit to the jury the issue of fraud in the procurement of the patent. *See* Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

means so as to remove the deposits with a minimum of damage to the part itself. While SGA may be composed of nutshells, it may also be composed of fruit pits, sawdust, rice hulls, corn cobs and clover seeds. The type of nutshells used may also be differentiated as either soft or hard. Agrashell sells SGA which is composed of black walnut and apricot pit shell, and Hammons sells SGA which is composed solely of black walnut shell.

Various companies processed or "manufactured" SGA in some form during the time periods in question. Agrashell of Los Angeles, California; Hammons of Stockton, Missouri; Gravette Shelling Company of Gravette, Arkansas[2] (Gravette); Block Brothers, Inc. of Nashville, Tennessee; and Block Walnut Processing Corp., of Nashville, Tennessee (known together as Block); Continental Nut Company of Chico, California (Continental); Industrial Flour and Abrasives Company of Morristown, Tennessee (Industrial Flour); Lufkin Pecan Company of Lufkin, Texas (Lufkin); Star of Texas Company of Fort Worth, Texas (Star of Texas); Texas Feed and Grain Company of Fort Worth, Texas (Texas Feed); and Southeastern Reduction Company of Valdosta, Georgia (Southeastern) are, or were during the periods of time in question, processors of SGA. Various companies distributed SGA, but apparently did not manufacture it: Pangborn Corporation of Hagerstown, Maryland (Pangborn); American Wheelabrator & Equipment Corporation of Mishawaka, Indiana (Wheelabrator) [both Pangborn and Wheelabrator were large manufacturers of blast cleaning equipment]; Composition Materials Company (Composition) [Block's jobber]; Bernard Sirotta Company of New York, New York (Sirotta) [which at one time sold Hammons' SGA], and several others distributed Agrashell's SGA.

The Pan American Petroleum Corporation developed another use for processed nutshell and patented the idea, giving Cherokee Laboratories an exclusive license under the patent for part of the time relevant here. Pan American's patent covered the use of processed nutshells in controlling the loss of circulation of drilling muds utilized in oil well drilling. Agrashell sells this "lost circulation material" (LCM) which is composed primarily of english walnut shell and thus different from its SGA. Hammons sells LCM which is almost identical to its SGA, except for somewhat different sizes of the particles. LCM may also be composed of nonnutshell products ranging from cotton seed hulls to golf balls. Other companies, including Gravette and Block, manufacture nutshell LCM.

The geographic markets for LCM and SGA are different. SGA is sold nationwide, with emphasis in the industrial northeast, while LCM is concentrated in the Mid-Continent and Gulf States oil producing regions.

### B. The Patent

Frank Perry, a civilian employee at an army air depot in California during World War II, learned that projecting ground black walnut shells of 10/15 or 10/30 mesh size against airplane engine parts constituted an ideal SGA. Perry applied for and was granted a patent, basically claiming

> "the *method* of cleaning metal by 'projecting there against a stream of fluid under pressure carrying in suspension therein pelletized black walnut shells,' and a *product*, 'an abrasive material for use in air blasts for cleaning metal comprising pelletized black walnut shells.'" Agrashell, Inc. v. Hammons Products Co., supra, 279 F.Supp. at 522.

It was later learned that apricot pits have very similar physical characteristics to the black walnut shell, and they are used interchangeably by Agrashell.[3] *Id.* at 523.

---

2. Hammons acquired the controlling interest in Gravette in August of 1966.

3. The Perry Patent Reissue indicates that the shells to be used were those "having

Perry assigned the patent to Turco Products Company, Inc., which granted an exclusive license to Agrashell. The patent was in turn assigned to Purex Corporation, when Turco merged with Purex, and finally was assigned by Purex to Agrashell. Throughout this entire period, dating from 1947, Agrashell had an exclusive license. The patent expired on June 10, 1964.

## C. The alleged Sherman Act violations

Hammons' claim was essentially that Agrashell had attempted to monopolize hard nutshells within the SGA markets in violation of section 2 of the Sherman Act by means of infringement suits and certain formal and informal contractual relationships so as to extend the Perry patent beyond its terms and life. Hammons also claimed that certain formal and informal contractual relationships unreasonably restrained trade in hard nutshells within the SGA markets in violation of section 1 of the Sherman Act because the arrangements extended the Perry patent beyond its terms and life.

### (1) The Sirotta suit

In 1958 Sirotta had begun to purchase Hammons' SGA for sale to Sirotta's customers. In October of 1960 Sirotta received a notice of infringement from Agrashell; Agrashell had in 1954 written Sirotta about the possibility of infringement liability. Sirotta contacted patent counsel who investigated the situation and concluded that there was insufficient basis to challenge the patent at least insofar as "prior art" was concerned. Sirotta was selling nutshell SGA, including black walnut and apricot pit SGA, for use in blasting equipment, including air blasting equipment. Settlement negotiations broke down between Agrashell and Sirotta and the infringement suit was filed in February of 1963.

During the course of taking a deposition Bernard Sirotta, the president of Sirotta, asked to speak to Ayers, the president of Agrashell, alone. Sirotta purportedly asked Ayers whether the suit could be settled as between two businessmen. Sirotta claims Ayers replied as follows:

"There can be only one way to settle this matter and that is for you to get out of the business. You have no right to be in the walnut shell business. This is my domain. If you do not leave the business, I will cut prices so low that you will not be able to survive."

Ayers contradicted this statement at trial and indicated that he only asked Sirotta about his position in light of the Perry patent and told Sirotta that he thought he was infringing the Perry patent.

Hammons was impleaded by Sirotta as a third party defendant on the basis of an indemnity agreement between Hammons and Sirotta established when Sirotta bought Hammons' SGA. Hammons resisted Sirotta's attempt to obtain jurisdiction over it, see Agrashell, Inc. v. Bernard Sirotta Co., 344 F.2d 583 (2d Cir. 1965), but finally entered a personal appearance in the suit in 1966 and counterclaimed against Agrashell for antitrust violations. The Sirotta litigation was settled when Sirotta payed $2,500 to Agrashell in 1968. Hammons' counterclaim in the Sirotta action was dismissed by stipulation without prejudice.

### (2) The Hammons suit

In April of 1962 Hammons agreed to supply Agrashell with black walnut shell of a mesh size suitable for blast cleaning. Shortly after the consummation of that agreement, Ayers visited with the Hammons officers. Although the evidence is conflicting, Ayers apparently informed Hammons that he had a patent

---

the hardness of black walnut shells," as well as, black walnut shell alone. The patent "contemplates the use of pellets of other types of ground or cracked nutshells having equivalent characteristics"

of black walnut shell. The testimony of both parties indicated that apricot pit shell and black walnut shell have similar hardness, resilence, and resistance to breakdown characteristics.

for cleaning metal utilizing black walnut shell. He indicated that his lawyers advised him to sue every shell grinder who was infringing the patent but that he did not intend to sue Hammons because Hammons had not been cutting prices. An official of Hammons testified that Ayers

"made us aware of the Perry Patent, and then also that there was some discussion on lost circulation material and he told us that the main purpose of his visit was to get acquainted, check our material, and to see if we couldn't work out a lost circulation price that would be profitable to everybody involved."

The official further testified:

"Mr. Ayers advised me that his attorney had advised him to sue everyone who was in the [sic] selling soft grit abrasive materials. However, that they didn't plan to sue everyone but they were going after those who were guilty of cutting prices."

The official was asked whether Ayers made any statements about Hammons' LCM price and the official responded that Ayers stated "he didn't think that we were cutting prices and from the prices that they gave me at that time, we were getting approximately the same prices, close, not exactly, but close."

In June of 1962 Hammons signed an LCM contract with a former customer of Agrashell. Shortly thereafter Ayers called Hammons wanting to know about the contract. Ayers was told only that there was a contract, but no specifics were given to him. About October of 1962 Agrashell began to complain about the SGA material supplied to Agrashell and its customers, indicating that Agrashell had received a number of complaints relating to objectionable dust in the Hammons product sold to Agrashell and to its customers. In November of 1962 Agrashell ordered Hammons to stop production for Agrashell's account with regard to the prior contract. In December of 1962 Agrashell sent Hammons a notice of infringement of the Perry patent.

Agrashell was willing to settle the matter based upon the payment of royalties on "pellets of black walnut shells, or other nutshells (including apricot pit shells) equivalent thereto for blast cleaning purposes" sold by Hammons for or used as SGA and requiring Hammons to accept a license. Negotiations broke down partly because Hammons did not consider apricot pit shell to come within the confines of the Perry patent but primarily because Hammons finally decided it would not pay the royalty after first evidencing an intent to settle on that basis. Agrashell's suit against Hammons was filed on August 7, 1963.,

In its complaint filed in 1965 after acquiring title to the patent, Agrashell alleged, among other things, that:

"Within the six (6) years last past, and within the term said reissued letters patent, defendant has manufactured, sold, used, and actively induced others to use within the Western District of Missouri and elsewhere pelletized nutshells having the hardness of black walnut shells, including pelletized black walnut shells and such pelletized nut shells having screen sizes of 10–30 mesh and 10–15 mesh, for the cleaning of articles by use of the pelletized nut shells in blasts projected against the articles. Defendant thereby has infringed said reissued letters patent."

Hammons answered, asserting affirmative defenses and counterclaims. Hammons alleged, among other things, that Agrashell had misused the patent by attempting to extend it to materials not covered including "walnut shells and/or ground fruit pits." Hammons counterclaimed asserting, among other things, that Agrashell had attempted to restrain and did restrain trade in commerce of ground black walnut shells in violation of the Sherman Act, 15 U.S.C. §§ 1–2. Hammons additionally claimed that the Perry Patent Reissue had been obtained by virtue of fraud in that Agrashell

knew of a prior patent covering the same conception patented in the Perry Patent Reissue.

A meeting between Agrashell and Hammons was arranged on March 24, 1966, by an official of Gravette who apparently wanted to clarify the situation between Gravette and Agrashell. The relationship between Gravette and Agrashell was awkward because while Gravette and Agrashell had engaged in certain contractual relationships, Hammons, who was being sued by Agrashell, was in the process of acquiring the majority of Gravette's stock. During this meeting, an official of Agrashell, apparently in response to a question from an official of Hammons about Agrashell's position in the lawsuit, indicated that if Hammons was interested in concentrating on the walnut meats alone, Agrashell would be interested in handling Hammons' shell product or acquiring their shell grinding facilities.

No agreement being reached and neither party having requested a jury, trial was commenced before the district court on March 20, 1967. On that day one of Agrashell's counsel moved to sever the antitrust counterclaim. The motion was taken under advisement. The district court held that the patent was invalid due to obviousness and therefore not infringed, but that even if the *method* claim was valid it was not infringed either directly or indirectly.[4]

Agrashell, Inc. v. Hammons Products Co., *supra*, 279 F.Supp. at 522–524. Prior to its judgment on the patent case, but after all evidence had been taken with regard to the infringement side of the suit, the district court ordered a con-

tinuance with regard to the antitrust counterclaim. The district court also declined to award attorneys' fees to Hammons.[5] See 35 U.S.C. § 285.

### (3) Contracts

Two types of contractual-like arrangements are involved in this case. The first is known as a "Statement of Policy" which Agrashell sent to some of its sales agents. The policy had three essential parts which are especially relevant: Agrashell reserved the right to set selling prices to the ultimate consumer invoiced by the agent; the selling agent agreed to buy, sell and merchandise *only* Agrashell SGA as long as the agent distributed Agrashell SGA; and Agrashell averred that it was the exclusive licensee under the Perry patent and had the exclusive right to convey the right to use SGA materials.

The Statement of Policy was first formulated some time in the late 1940's. Agrashell contended at trial that the agents who sold its SGA were never bound by the provisions of the policy, and two of Agrashell's agents testified that they were neither familiar with the Statement of Policy nor operated under it. However, there is Agrashell correspondence which tends to support the inference that the Statement of Policy was agreed to by some of the agents.

While there was Agrashell correspondence which indicated the possibility of sale of SGA to agents for resale, there was direct evidence from two of Agrashell's agents who testified that they never took title to the goods, never insured against loss, never paid storage costs,

---

4. In the judgment the district court did not explicitly state whether the product claims would have been infringed by the Hammons product if the patent was valid. But in the trial of the antitrust counterclaim the same district judge referred to the Hammons product as an "admittedly infringing product."

5. During the trial of the antitrust counterclaim the trial judge explained why he did not award attorneys' fees to Hammons in the patent case:

"I had read the few cases that are in the books under it [35 U.S.C. § 285] and to me, the determining factor was a question of good faith and I—whether I had the proper interpretation of good faith or not, I came to the conclusion there was no question that the plaintiffs [Agrashell] thought they had a valid patent, they were trying to uphold what they thought was a valid patent, and they brought the suit in good faith in that sense * * *."

never paid taxes on the goods, and were merely paid a commission for the sales they made of Agrashell's products.

The second type of contractual arrangement involved the negotiation of more formal contracts with Wheelabrator and Pangborn. The contract with Wheelabrator was negotiated in 1950, and it appointed Wheelabrator, a large manufacturer of blasting equipment, Agrashell's *del credere* factor for the sale of SGA. The contract also established that Wheelabrator was to receive a commission on the sale of Agrashell's SGA, that Wheelabrator did not need to maintain an inventory of SGA, that Agrashell would ship directly to the buyer, and that Agrashell would be able to set the selling price. If, for certain enumerated reasons, Agrashell could not fill Wheelabrator's orders, Wheelabrator, after notification to Agrashell, was free temporarily to obtain similar materials for its requirements. This contract could be terminated by giving notice 60 days prior to any anniversary date thereof.

The contract with Pangborn, another large blast cleaning equipment manufacturer, was negotiated in settlement of an infringement suit brought by Agrashell against Pangborn. Pangborn had been selling black walnut SGA obtained from Gravette.

The Pangborn agreement bound Pangborn to handle only Agrashell SGA until the patent expired, and after that time, for a period of some three years, Pangborn agreed to buy from Agrashell all of the SGA it needed unless a competitor could quote a lower price on similar quality goods, in which case Pangborn remained bound to buy from Agrashell unless Agrashell elected not to meet the lower price. The Pangborn agreement did not allow Agrashell to set prices. An administrative assistant to the president of Pangborn testified that at no time under the contract did Pangborn own the Agrashell product or pay taxes or freight costs thereon.

### (4) Related activity

On June 13, 1962, Ayers visited Jimmy Cox, president of the Block companies. Block had been active in the LCM and black walnut shell SGA markets. The substance of the conversation between Ayers and Cox purportedly involved Ayers' dissatisfaction with the price structure in the LCM market in particular and the shell business in general. Ayers noted that he had a price stabilization plan for the LCM market, but Cox would not agree to any price stabilization plan. Ayers indicated that if Block would not agree, Agrashell would enforce its patent. About a month later Block received a notice of infringement from Agrashell.

Suit based, in part, on the Perry patent was filed against Block in March of 1963. The suit was finally settled for $2,500, with Block paying half and Composition Materials, its jobber, paying half. Ayers contradicted Cox's testimony concerning this incident at the trial and contended that the only purpose for his visit to Block was to speak about Block's infringement of the Perry patent with regard to SGA and to speak about a joint promotional program for the sale of LCM.

After Agrashell's settlement with Pangborn, an official of Gravette approached Agrashell with the proposition that Gravette might become licensed under the Perry patent. Gravette had concluded that if Pangborn was satisfied that the Perry patent was valid it too would recognize the patent. During a meeting between the president of Agrashell and officials of Gravette, Ayers allegedly stated that there was "one of two ways this can be handled, either by lawsuit or by negotiating a contract." A contract was negotiated by Agrashell and Gravette with Gravette agreeing to supply black walnut shell processed and suitable for use as LCM, although 10 percent of the material might be shell suitable for SGA use. The contract, which was negotiated prior to the expi-

ration of the patent, extended some three years after the expiration of the patent.

### D. The Verdict and Damages

The district court sent the counterclaim to the jury after five weeks of trial, but he refused to submit the issue of whether the patent had been fraudulently procured because he felt that no submissible case of patent fraud had been established. The jury returned a verdict in favor of Hammons and assessed damages in the sum of $204,124.21. That sum was comprised of $162,374.21 for litigation expenses and, $41,750.00 for loss of profits. The jury assessed no damages for injury to going concern value. The gross amount of damages was trebled by the district court and that sum equaled $612,372.63. The district court awarded attorneys' fees of $150,000.00 and costs of $13,361.31. The total judgment was $775,733.76.

The litigation expense damage was predicated upon Hammons' proof of the amount it had spent to defend the patent infringement suit brought against Sirotta, $20,455.20, and the amount it had spent to defend the infringement suit Agrashell brought against Hammons itself, $141,919.01.

The jury award of $41,750.00 in damages was apparently based upon evidence adduced by Dr. Kuhlman, an economist. His testimony concerning the damages sustained by Hammons was the only theory of damages Hammons presented and is summarized later in this opinion.

### Issues Presented on Appeal

In its appeal from the judgment of the trial court, Agrashell raises these issues:

1. Whether Hammons failed to establish that Agrashell had violated the Sherman Act and by so doing proximately injured Hammons.

2. Whether Hammons' claims were barred by principals of res judicata, collateral estoppel, or compulsory counterclaim.

3. Whether certain instructions relating to "dangerous probability," prosecution of the suit for patent infringement, "target area," and agency arrangements, were prejudicially erroneous.

4. Whether prejudicial error occurred in the conduct of trial relating to the issues of waiver of jury trial, admission of deposition testimony, and exclusion of offers of compromise.

### Sufficiency of Proof of Sherman Act Violations and Damages

Hammons alleged violations of both section 1 and section 2 of the Sherman Act. After a careful review of all of the pleadings, testimony and exhibits, we are convinced that Hammons did make a submissible case under section 1 of the Sherman Act but did not make a submissible case under section 2 of the Act; and that the trial court should have granted the motion for a directed verdict made at the close of all of the evidence as to section 2. That motion stated, in part, that "Hammons has not established by sufficient competent evidence a violation of . . . section 2 of the Sherman Act by Agrashell."

### A. Section 1

Section 1 of the Sherman Act proscribes contracts in restraint of trade or commerce. Hammons claims that the written contracts with Pangborn and Wheelabrator and the "Statement of Policy"[6] used with Agrashell's sales agents as heretofore described, and the alleged illegal use of the patent in those contracts, constituted restraint of trade, and that as a result of those alleged contracts in restraint of trade, it was dam-

---

6. Although the trial judge commented that the "Statement of Policy" pertained to the intent issue under section 2, Hammons' proof also presented the "Statement of Policy" in terms of section 1.

aged by loss of business. Agrashell claimed that the contract with Wheelabrator did not require Wheelabrator to deal exclusively in Agrashell's SGA; that the requirement to that effect in the contract with Pangborn terminated upon the expiration of the patent; that the "Statement of Policy" was not a contract but a unilateral declaration by Agrashell which could not be and was not enforced; that in any event Pangborn, Wheelabrator and the other sales representatives were not purchasing for resale but merely selling as agents for the account of Agrashell with Agrashell retaining title to the goods until delivery to a buyer and therefore under United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), such sales agency agreements with price fixing provisions were legal, especially in view of the patent and the presumption of validity that attached thereto prior to its expiration; and that before recovery can be had under section 1 of the Sherman Act, Hammons must prove damages with a reasonable degree of certainty resulting from the alleged illegal contracts. While there is much merit in several of these allegations by Agrashell, we cannot say that the evidence was insufficient for the jury to find that the Pangborn and Wheelabrator contracts were violative of section 1 of the Sherman Act.

■ First, we conclude that Hammons failed to prove that the Statement of Policy established either formal or informal contractual relationships with Agrashell and its agents in the market place. Hammons called no agents to testify as to their relationships with Agrashell, but relied solely on Agrashell's correspondence which indicates that the Statement of Policy was sent to a number of agents. In contrast, there was only one letter which tends to prove that Agrashell would not deal with an agent unless he agreed to the Statement of Policy. Moreover, some of the correspondence clearly indicates that Agrashell dealt with the agents whether or not they agreed to the Statement of Policy.

More significant, in terms of the practical application of the Statement of Policy in the market place, is the testimony of two Agrashell agents allegedly subject to the Statement of Policy. William T. Hall, chairman of the board of the C. P. Hall companies, together one of the largest if not the largest Agrashell agent, testified that he had never seen nor heard of the Statement of Policy. He further testified that he did not consider himself bound to deal only with Agrashell, and that he did deal in other types of SGA such as corn cob SGA and glass SGA. John C. Lorenzen, a partner in the Russ-Cattell company, likewise testified that he had never seen the Statement of Policy. Furthermore, Lorenzen testified that he handled other types of SGA.

■■ Second, Agrashell strenuously argues that the Wheelabrator contract with its price fixing provision was legal when viewed in light of the doctrine promulgated in United States v. General Electric Co., *supra,* 272 U.S. at 488, 47 S.Ct. 192. *General Electric* stands for the proposition that a patent holder does not violate the antitrust laws by seeking to dipose of his products directly to the consumer and fixing the price by which his agents transfer the title from him directly to the consumer. On the other hand, *General Electric* does not allow the patent holder to sell his product to a person and then control the resale price. Assuming that the Wheelabrator contract was a contract of agency, *see* Restatement (Second) of Agency § 14J (1958), we think that whatever protection *General Electric* afforded the Wheelabrator contract ended when the patent expired. *See generally* R. Nordhaus and E. Jurow, Patent-Antitrust Law at 147–166 (Nordhaus Ed. 1972). *Cf.* Simpson v. Union Oil Co., 377 U.S. 13, 21–24, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). Since it was clear that the Wheelabrator contract was in effect continuously from 1950, we think the jury could have correctly concluded that the Wheelabrator contract extended the life of the patent

beyond the expiration date and constituted a contract in restraint of trade.

■ Third, the Pangborn contract, negotiated prior to the expiration of the patent, extended the power of the patent beyond the life of the patent. The contract provided:

"If, after June 10, 1964, PANGBORN furnishes written evidence of its ability to purchase blast cleaning aggregates made from nut shells of equal quality and at lower prices than AGRASHELL'S selling prices to PANGBORN, AGRASHELL shall have the privilege of either meeting such prices as quoted from a bona fide supplier or permitting PANGBORN to purchase its requirements elsewhere after first tendering the order to AGRASHELL in writing."

Since the Pangborn contract was negotiated prior to the expiration of the patent, but extended past the expiration of the patent:

"[A]ny attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purposes of the patent laws. . . ." Scott Paper Co. v. Marcalus Manufacturing Co., 326 U.S. 249, 256, 66 S.Ct. 101, 104, 90 L.Ed. 47 (1945). *Accord,* Brulotte v. Thys Co., 379 U.S. 29, 31, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964).

The Supreme Court, when faced with a somewhat similar provision, has noted the antitrust implications:

"The appellant had at all times a priority on the business at equal prices. A competitor would have to undercut appellant's price to have any hope of capturing the market, while appellant could hold that market by merely meeting competition. We do not think this concession relieves the contract of being a restraint of trade, albeit a less harsh one than would result in the absence of such a provision. . . ." International Salt Co., Inc. v. United

States, 332 U.S. 392, 397, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947).

As a consequence, we conclude that the jury was entitled to find that the Pangborn contract extended the life of the patent unlawfully and constituted a contract in restraint of trade.

Turning now to Agrashell's argument that Hammons failed to prove the fact of damage resulting from the use of the contracts and Statement of Policy, it should first be noted that its expert testimony concerning its damages and the computation thereof does not include any reference to any loss of business which it once had, but only business which Agrashell had during the entire period in question and which Hammons felt that it *should* have had. In this respect this case is analogous to the case of Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 910 (2d Cir.), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed. 85 (1962), in which Judge Friendly noted as follows:

"Plaintiff's theory here was not that acts by defendant had unlawfully deprived it of something it previously possessed. It could not well have been so, since there was nothing to indicate that defendant's conduct had changed for the worse during the damage period or, indeed, since plaintiff was organized, and plaintiff's original investment of $10,000 had produced an earned surplus of over $300,000 by 1961, after substantial salary payments to Mr. Schwabe, its sole stockholder, and dividends. Plaintiff's evidence, therefore, was necessarily directed to attempting to show how defendant had unlawfully deprived it of business it might otherwise have secured. It was entirely competent for plaintiff to seek to show this . . . ."

Indeed, the evidence showed that both Agrashell and Hammons prospered during the period in question and made overall gains in the sale of their nutshell products.

Hammons' evidence of damages was adduced from the expert testimony of Dr. Kuhlman during which the charts summarizing the damages were submitted. Briefly stated, Dr. Kuhlman first gave his opinion that Agrashell had erected barriers around a portion of the hard nutshell SGA market. These barriers were the patent, the patent litigation, price fixing, and exclusive dealing arrangements. He then looked for a portion of the market where those barriers were not present or at least not a factor and chose the Columbus, Ohio SGA market. The sole customer in this market was Western Electric. Both Agrashell and Hammons sold to Western Electric, Hammons selling direct and Agrashell selling first by agents and later direct. Having thus found what he considered to be a market without barriers, he determined that over a period of years Hammons had 60 percent and Agrashell had 40 percent of the SGA business in that market. He then concluded that therefore Hammons should have 60 percent of *all* of Agrashell's SGA business which it conducted through its principal agents. He figured Hammons' damages by taking the average price at which Agrashell sold in the Columbus market, multiplied by 60 percent of Agrashell's volume with its dealers and deducted therefrom the amount for which Hammons sold the same volume of material as LCM. His theory in this regard was that if the barriers had not existed Hammons would have been able to sell this substantial quantity of material as SGA at $109 per ton average rather than as LCM at $83 per ton average and that therefore Hammons' damages were $26 per ton of 60 percent of the tons which Agrashell sold through its dealers, or a total of $160,924.55. This approach, although unique, has many practical defects.

The first defect is in the use of the Columbus market as a fair example of what might have happened nationwide in the absence of the barriers. In the first place, there was only one customer in the market, and it bought in substantial quantities as distinguished from most of Agrashell's customers who bought in smaller quantities from stocks shipped into warehouses for distribution by agents. Secondly, there is no evidence as to whether or not that customer bought only from Agrashell and Hammons or also from other suppliers. More importantly, the evidence is clear that Agrashell sought to sell to Western Electric, SGA composed of both black walnut shells and apricot pits while Hammons offered a product composed of only black walnut shells. The evidence also establishes that Western Electric was a sophisticated buyer and may not have always used the two products interchangeably.[7]

Dr. Kuhlman acknowledged that in making his estimate of damages he had not considered the impact of sales of SGA by companies other than Agrashell and Hammons. Even assuming that the alleged barriers kept Hammons from its fair share of the market, it is difficult to understand how anyone could reliably determine what share Hammons should have had without knowledge of the market shares other competitors might have captured.

In addition, Dr. Kuhlman did not explain why Agrashell's alleged anticompetitive conduct, which was supposedly so effective in other places, was not effective in the Columbus market. Apparently one reason for selecting the Columbus market was the fact that both Agrashell and Hammons had been in some sort of competitive relationship for a number of years. The failure to explain why the Columbus market was isolated from Agrashell's conduct is highly suspect considering some of the evidence adduced at the trial. For instance, in 1962 when Agrashell did use an agent in

---

7. Evidence that Western Electric did not consider the products interchangeable is the fact that during the three years that Agrashell made no sales in the Columbus market (1963–1965), Hammons' sales did not increase as a result.

the Columbus market and when the patent was still viable Hammons sold 111 tons of SGA and Agrashell 47. In 1963 when Agrashell wrote to Western Electric using the words "patent protected soft grit abrasive," a technique which Kuhlman specifically labeled as a "barrier," Hammons sold 98 tons of SGA and Agrashell sold none. Still further in 1967 and 1968, long after the patent expired and long after Agrashell had ceased doing business with an agent in the Columbus market, Hammons' sales fell dramatically with Hammons selling 29 tons in 1967 to Agrashell's 114.325 tons, and 54 tons in 1968 to Agrashell's 127.25 tons.

In applying the percentages derived from the Columbus market, to the national market serviced by Agrashell's agents, Hammons' expert witness seemingly ignored critical differences between the two markets. In the Columbus market shipments were made direct in large quantities, thereby allowing Hammons to compete without agents or warehouse facilities. Most of Agrashell's ultimate customers, serviced by its agents, bought in smaller quantities after Agrashell had established regional warehousing permitting prompt delivery of various sizes and types of its products. Hammons sold direct, or to jobbers for resale from warehouses owned by the jobbers, or by manufacturers' representatives with orders shipped direct from Hammons' plant. Hammons did not maintain regional warehouse facilities in order to service these smaller orders.

The evidence indicates that Hammons' representatives visited Pangborn in 1958 and 1962—both visits apparently coming before Pangborn was an Agrashell agent. There was also correspondence with Pangborn in 1961—before Pangborn was an Agrashell agent. Hammons made no attempt to solicit the business of C. P. Hall of Ohio. Apparently the only attempt to acquire the business of C. P. Hall of Illinois was the sending of a sample to Hall after *Hall* called Hammons after receiving a form letter solicitation. No further attempt was made to contact C. P. Hall of Illinois. It is noted that the C. P. Hall Companies combined composed well over one-third of the business Hammons claimed to have lost. Solicitation of the Wheelabrator business involved sending two letters in response to a form letter from Wheelabrator trying to sell a machine to Hammons. The evidence indicates that Wheelabrator actually bought SGA from Hammons; some four to five 50 pound bags. This evidence tends to indicate two things. First, Hammons' sales efforts were rather ill-suited to acquiring the business of Agrashell agents. Second, when Hammons did try to solicit the business of the agents, at least C. P. Hall and Wheelabrator either bought or expressed an interest in the Hammons' product, and apparently did not consider themselves bound to deal only with Agrashell. This conclusion is strengthened by the testimony of Hammons' own vice president that he could not recall ever being told by an Agrashell agent that it could not deal in a Hammons' product because of the Perry patent or the Statement of Policy.

More importantly, there was no evidence tending to show why Hammons could not sell direct or through agents to the ultimate consumers who were purchasing from Agrashell through Agrashell's agents. It is clear that the so-called barriers did not stop Hammons from selling a similar product to Western Electric, or to the automobile manufacturers in the Detroit area where it had 100 percent of the SGA market. It is also clear that Agrashell's ultimate consumers were paying higher prices than Hammons was receiving in its sales to Western Electric, which should have made it easier for Hammons to compete for this business.[8] One conclusion that

8. When Dr. Kuhlman was asked why Hammons failed to attempt to sell to Agrashell's ultimate consumers, he was un- able to explain other than by vaguely referring to restrictions wherever Agrashell sold through an agent. To the contrary,

could be reached is that the only thing that kept Hammons from selling to the ultimate consumers serviced by Agrashell's agents from Agrashell's warehouses is either the failure of Hammons to actively solicit the business or its failure to maintain regional warehouse facilities to permit prompt delivery of small quantities of a variety of sizes of SGA. The evidence discloses very little active solicitation of Agrashell's ultimate consumers by Hammons, and the premise of Dr. Kuhlman that Hammons would have obtained 60 percent of their business except for the alleged barriers is highly questionable in light of these facts.

We also note that Dr. Kuhlman based his damage estimate on the implicit assumption that the patent and the patent litigation constituted illegal barriers in addition to the exclusive dealing and price fixing provision of the contracts. The assumption that the patent was an illegal barrier prior to its expiration was conclusively negated when the trial judge ruled that the patent had not been fraudulently procured. Likewise the assumption that the patent litigation constituted a unilateral attempt to monopolize and thus an illegal barrier is negated by our finding later in this opinion that Hammons failed to make a submissible case of an attempt to monopolize. Thus two of the four structural supports of Kuhlman's damage theory were highly questionable.

■ ■ We have described some of the serious failings of Dr. Kuhlman's damage testimony to indicate our hesitancy to allow a jury to assess damages upon such a theory:

"[P]roof of an isolated violation of substantive law will not entitle defendants to an affirmative recovery. Before a party is entitled to recover treble damages he must be able to plead and prove actual monetary injury to his business or property result-

ing from the illegal act. . . . It has long been the law that damages which are purely speculative, remote, or based upon conjecture cannot serve as a base for antitrust recovery. . . ." American Infra-Red Radiant Co., Inc. v. Lambert Industries, Inc., 360 F.2d 977, 995–996 (8th Cir. 1966).

Our critique of this damage formulation must be tempered, however, by the Supreme Court's statements relating to the proper function of an appellate court when reviewing damage evidence. As the Supreme Court has forcefully stated:

"[An antitrust plaintiff's] burden of proving the fact of damage under Section 4 of the Clayton Act is satisfied by his proof of *some* damage . . . inquiry beyond this minimum point goes only to the amount and not the fact of damage. It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under Section 4." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969).

The Supreme Court has consistently reminded critics of damage formulations that an antitrust violator may not properly complain about damage proof vagaries when such ambiguity results from the illegal act itself. *See e. g.*, Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927). With these principles in mind we cannot say that as a matter of law, Dr. Kuhlman's theory failed to demonstrate the fact or quantum of damage with sufficient clarity. For these reasons the jury award of $41,750.00 must stand.

Dr. Poe, Agrashell's expert, could find nothing in the agreements or Statement of Policy which would impose a barrier to the ultimate consumer. In fact, if Agra-shell held up its price, it should be expected that another seller could come in and sell at a lower price.

■ Our inquiry does not end with this finding however. The award of litigation damages allegedly incurred by Hammons when Agrashell filed certain infringement suits must stand or fall on whether the jury could properly conclude that Agrashell "attempted to monopolize" under section 2 of the Sherman Act. It is clear that the act of filing the infringement suits is a unilateral act and section 2, in contrast with section 1, is the proper method to test unilateral activity such as that involved in this case:

> "The Congress which wrote the Sherman Act directed its main thrust against business conduct involving two or more parties. Section 1, proscribing every 'contract, combination or conspiracy' in restraint of trade, is strictly confined to joint action. Section 2 covers both individual and joint action . . . ." Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655 (1962).

### B. Section 2

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States * * *." Hammons claimed that Agrashell attempted to monopolize the SGA and the LCM markets although its proof relating to attempted monopolization of the LCM market was quite limited, and during the course of the trial and in its instructions the district court indicated that evidence of Agrashell's actions as to LCM was relevant only to the issue of intent.

■ In addition to proving an overt act or acts, the essential elements which must be proved in a section 2 attempt to monopolize case are specific intent and dangerous probability. *See* Swift and Co. v. United States, 196 U.S. 375, 396, 402, 25 S.Ct. 276, 49 L.Ed. 518 (1905); Kansas City Star Co. v. United States,

240 F.2d 643, 663 (8th Cir.), cert. denied, 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957); Hibner, Attempts to Monopolize: A Concept in Search of Analysis, 33 A.B.A.J. 165, 171–177 (1967); Smith, Attempt to Monopolize: Its Elements and Their Definition, 27 Geo. Wash.L.Rev. 227, 229–231 (1957).

Although we do not rest our decision relating to section 2 on this issue, we note that the evidence presented at trial with regard to "specific intent" bordered on being insufficient as a matter of law. The issue before the jury was whether Agrashell specifically intended to monopolize hard nutshells within the soft grit abrasive markets by seeking to extend the patent beyond its terms or by extending the life of the patent.

■ At the outset, we emphasize that the trial court did not submit the issue of fraudulent procurement of the patent to the jury and no cross-appeal was taken on that issue. Thus the declaration of patent invalidity did not prohibit Agrashell from relying on the presumptive validity of the patent. It therefore had every right to bring each of the three lawsuits against Sirotta, Hammons, and Block if its purpose in each case was merely to enforce its rights under the patent. The obvious and difficult problem in this case relates to differentiating between Agrashell's intent to bring suits and enter into contracts under a presumptively valid patent, thereby enforcing and utilizing a lawful monopoly, and its alleged intent to bring suits and enter into contracts under a presumptively valid patent for the purpose of extending the scope of the patent beyond the grant allowed by law. The proof of that alleged illegal intent is thin indeed.

The evidence in this case indicates quite clearly that Hammons sold a product that, but for the declaration of invalidity, would have infringed Agrashell's patent; that Sirotta sold the Hammons product, which, as the trial judge indicated, was an "admittedly infringing" one; that Gravette and Block also sold

an SGA product which was composed of black walnut shell and that Pangborn at one time merchandised Gravette's product; and that Sirotta's patent counsel and Pangborn's patent counsel could not find sufficient grounds for challenging the patent on the grounds the patent was subsequently declared invalid.

Much of Hammons' case rested on the deposition testimony of Sirotta relative to Ayers' statement that Sirotta "had no right in the walnut shell business. This is my domain." It is noted that when this statement was made Ayers had already filed his infringement suit and placed the infringement issue before a court. Moreover, it was Sirotta and not Ayers who precipitated the meeting at which the statement was allegedly made. Understandably we are hesitant to attach much significance to this statement.

We are also hesitant to attach any significance to the evidence which indicates that Agrashell sued Hammons in retaliation for Hammons underbidding Agrashell on an LCM account or to evidence which tends to indicate that Agrashell sued Block because Block would not agree to maintain prices in the LCM market.

We question this evidence because, although Hammons pleaded an attempt to monopolize the LCM market, the relevant markets which were the subject of the attempt to monopolize as defined by the trial judge were solely the SGA markets. Hammons does not question this instruction. Indeed by supplemental brief Hammons argued that it need not prove "dangerous probability" in the LCM markets precisely because of the judge's limited instruction. Although Hammons contends that the LCM intent evidence somehow relates to the issue of intent in the SGA market, we attach little significance to conduct related to a totally distinct product being sold in a different geographic market.

We turn next to an analysis of whether or not Hammons proved "dangerous probability" of monopolization.

"The phrase 'attempt to monopolize' means the employment of methods, means and practices which would if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it * . * *." American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946); Central Savings and Loan Ass'n v. Federal Home Loan Bank Board, 422 F.2d 504, 509 (8th Cir. 1970); Hiland Dairy Inc. v. Kroger Co., 402 F.2d 968, 971 (8th Cir. 1968), cert. denied, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969); Kansas City Star Co. v. United States, *supra*.

Thus in this case we must determine whether Hammons presented sufficient evidence from which the jury could properly conclude that Agrashell approached "so close [to monopolization] as to create a dangerous probability of it * * *." American Tobacco Co. v. United States, *supra*, 328 U.S. at 785, 66 S.Ct. at 1127.

In Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), the Supreme Court held that enforcement of a fraudulently procured patent may violate section 2 of the Sherman Act provided all other elements are established. This case relates to extending a patent beyond its lawful bounds, but we think the same considerations expressed in *Walker Process* are applicable here. Those considerations are essentially that, even though one possesses a fraudulently procured patent or a patent which is allegedly used in a way to enlarge its scope or life, an analysis of market factors is still necessary. Indeed, the Court specifically stated that the trial court had not "analyzed any economic data" when it reversed. *Id.* at 178, 86 S.Ct. 347. Thus it is not enough to argue that one has used a patent in a predatory manner thereby enlarging the scope or life of the patent; one must look to economic data to determine the impact of the purported illegal activity

on the market which is the subject of the attempt to monopolize.

"To establish monopolization or attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act, it would then be necessary to appraise the exclusionary power of the illegal patent claim in terms of· the relevant market for the product involved. Without a definition of that market there is no way to measure Food Machinery's ability to lessen or destroy competition." Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., *supra*, 382 U.S. at 177, 86 S.Ct. at 350. *See also* Bernard Food Industries, Inc. v. Dietene Corp., 415 F.2d 1279, 1284 (7th Cir. 1969), cert. denied, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970).

The counterclaim filed by Hammons indicated the product to be "ground black walnut shell," and in submitting the matter to the jury the trial court referred to "the soft grit abraisve industry" and "hard nutshells within the soft grit abrasive markets." The patent refers to "an abrasive material comprising pelletized nut shells having the hardness of black walnut shells." Our conclusion is that while the exact definition of the product is elusive, the proof primarily related to crushed black walnut and apricot pit nutshell used as SGA.

Assuming that the product was thus defined, the definition of the geographic market is even less explicit. Since no attempt was made to narrow the geographic area, we assume the relevant market area is the entire United States. However, no market data was introduced showing the total volume of sales of hard nutshell SGA in the United States or any specified portion thereof; therefore, it is difficult, if not impossible, to know exactly what geographic market Hammons claims Agrashell attempted to monopolize. The two principal submarkets identified by Hammons were De-

troit, Michigan and Columbus, Ohio. In Detroit, Hammons apparently had the entire market, and in Columbus, it had a larger share than Agrashell.

Not only did Hammons fail to show the total sales or volume of SGA, it also failed to show what shares of that market were held by Agrashell, Hammons, and several other major competitors.[9] Continental was referred to as one of the five largest companies in the field but no evidence was introduced relating to its volume of sales. Only by associating widely disconnected and at times contradictory portions of the evidence is it possible to piece together the respective sales of Agrashell and Hammons.

Hammons' pleadings attempted to structure the relevant market to include LCM, but by supplemental brief Hammons agreed that LCM was not within the markets the jury was instructed to consider as being the target of the attempt.

In conclusion, we view the evidence relating to "dangerous probability" in this case much as Judge Brown viewed the evidence in Becker v. Safelite Glass Corp., Inc., 244 F.Supp. 625, 638 (D. Kan.1965), in which he noted as follows:

"In the case at bar, plaintiff is unaware of the total annual volume of commerce * * * in the relevant market area; the portion or percentage of that volume held by defendants; the portion or percentage of that volume held by the plaintiffs; and the portion or percentage of that volume affected by any activities of the defendants * * *.

* * *

"Without the facts and evidence which plaintiff admittedly does not have, a § 2 Sherman case simply cannot, in our opinion, be established."

*See generally* Central Saving and Loan Ass'n v. Federal Home Loan Bank Board, *supra*; Hiland Dairy, Inc. v.

---

9. Of the three manufacturers sued or threatened with suit by Agrashell (Block, Gravette, and Hammons), Block continued to produce SGA throughout the

periods relevant here, Hammons sales nearly doubled, and Hammons acquired the controlling interest in Gravette in 1966.

Kroger Co., *supra;* Kansas City Star Co. v. United States, *supra;* Cornwell Quality Tools Co. v. C. T. S. Co., 446 F. 2d 825, 832 (9th Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972); Hibner, Attempts to Monopolize: A Concept in Search of Analysis, 33 A.B.A.J. 165, 171–177 (1967).

We are aware that the case of Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964), is not in accord with the result we have reached in this case, but we choose not to follow its rationale,[10] especially in view of the fact that the case of Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., *supra,* was decided by the Supreme Court subsequent to the *Lessig* case and in view of the decisions of this Court hereinbefore cited.

### Other Alleged Errors

Agrashell claims that Hammons' recovery of litigation expenses was barred by principles of res judicata and compulsory counterclaim. Our resolution of the sufficiency of proof with regard to section 2 of the Sherman Act obviates the necessity of resolving this issue with regard to litigation expense damage. Likewise errors allegedly made in instructing the jury with regard to litigation damages need not be discussed.

 Agrashell further argues that Hammons' section 1 claims should have been pleaded as a compulsory counterclaim in the first infringement suit filed by Agrashell against Hammons in the Western District of Missouri. However, we think that the instant case is controlled by Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661, 671, 64 S.Ct. 268, 88 L.Ed. 376 (1944), which indicates that cases such as this one involve permissive, not compulsory, counterclaims. Furthermore, since the first suit was dismissed because of Agrashell's failure to join an indispensable

party, since no judgment on the merits was had, and since Agrashell was explicitly allowed to file a new action, which it elected to do, no injustice has resulted from permitting the filing of the counterclaim in this action.

 Agrashell argues that the instructions were in error because of a failure to adequately define Agrashell's agency arrangements. We do not think that if any error occurred that it was prejudicial, and our resolution of the section 1 claim assumes that valid agency relationships existed. Agrashell further argues that it was an abuse of discretion to relieve Hammons of its waiver of jury trial. Due to the complexity of this case and the fact that Hammons changed from patent counsel to antitrust counsel during the varying procedural phases of this case we do not think that such a decision was an abuse of discretion. *See generally,* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2334 at 123 (1971).

 Agrashell next argues that it was an abuse of discretion to allow Hammons to deviate from a pretrial narrative statement by introducing into evidence the deposition testimony of Cox and Sirotta. Rule 16 of the Federal Rules of Civil Procedure allows for modification of a pretrial order to prevent manifest injustice. The trial judge explicitly indicated that he was acting in the interest of justice and fair play in allowing the deposition testimony, and indicated that the testimony might well have not been available earlier because the parties were in litigation in 1967 and could have been reluctant to speak. We do not think that the decision in this case was an abuse of discretion. *See generally,* 6 C. Wright & A. Miller, Federal Practice and Procedure § 1527 at 608 (1971); *Cf.* Labbee v. Roadway Express, Inc., 469 F.2d 169, 172 (8th Cir. 1972).

10. The strength of the *Lessig* rationale in the Ninth Circuit is questionable. *See* Bushie v. Stenocord Corp., 460 F.2d 116, 121 (9th Cir. 1972); Cornwell Quality Tools Co. v. C. T. S. Co., *supra.*

Finally, Agrashell argues that it was error to exclude its evidence of settlement offers made to Hammons after the filing of the suit. The trial judge indicated quite clearly that he was afraid the probative value of this evidence was outweighed by the prejudicial impact the evidence might have had on the jury. We think the judge's decision in this respect was carefully considered and not error. Other allegations of error raised in the briefs have been considered, but in our opinion are not valid and do not require comment.

### Conclusions

We affirm that part of the judgment awarding Hammons $41,750.00 trebled in the amount of $125,250.00. The remaining judgment, consisting of litigation expense damages, is reversed with directions to dismiss that portion of the case. Attorneys' fees and costs in the prosecution of this case should be redetermined by the district court and substantially reduced to an amount more in keeping with the revised judgment.