ther factual findings in accordance with this opinion.

The petition of cross-appellant, Anderson–Greenwood Aviation Corp., for rehearing by the panel is denied. The court, on its own motion, amends its judgment in the following manner:

1. That the district court should certify to this court any further findings made by the bankruptcy court and any further review made by the district court of those findings within a reasonable time after the district court has reviewed such findings in accord with this court's opinion. In the event the matter is not otherwise disposed of by and between the parties, the findings of the bankruptcy court and the review of those findings by the district court may be certified to this court for further review without the necessity of filing a new notice of appeal.

2. That the court vacates that portion of its opinion as related to AGCO's appeal under Part II–A entitled "Timing of Payments by Check Under Section 547." This court remands that issue to the district court on the ground that the district court declined to resolve the issue. AGCO now asserts that it did not concede the mootness of the issue in the district court nor in this court. Although the reasons stated by AGCO for not being specific in its briefs are somewhat dubious, we nonetheless feel in the interests of justice that AGCO should have a right to assert its contention on this issue before the district court and the district court should then determine whether or not there is mootness involved and if not, render its judgment on the issue. Any decision by the district court on this matter may be certified to this court at the same time that certification is made relating to the additional findings required of the bankruptcy judge. Certification may take place without a new notice of appeal and this court, upon receiving the certification by the district court, may then set down any additional briefing schedule if necessary.

The issuance of the mandate of this court's judgment will now be deferred until such time as this court rules upon the certified findings by the district court, or until such time this court determines otherwise. If the parties dispose of this matter so as to obviate further review, they are directed to notify the clerk instanter.

NATIONAL FARMERS'
ORGANIZATION, INC.,
Appellant,

National Farmers' Organization
Dairy Farmer Class,

v.

ASSOCIATED MILK PRODUCERS, INC., Mid–America Dairymen and Central Milk Producers Cooperative, Appellees.

NATIONAL FARMERS'
ORGANIZATION, INC.,

National Farmers' Organization Dairy Farmer Class, Appellant,

v.

ASSOCIATED MILK PRODUCERS, INC., Mid–America Dairymen and Central Milk Producers Cooperative, Appellees.

Nos. 87–1046, 87–1047.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 12, 1987.

Decided July 5, 1988.

Rehearing and Rehearing En Banc Denied Sept. 13, 1988.

David A. Donohoe, Washington, D.C., for appellant.

Donald M. Barnes, Washington, D.C., for appellees.

Before HEANEY and McMILLIAN, Circuit Judges, and BEAM *, District Judge.

HEANEY, Circuit Judge.

This private antitrust action is before the Court for the second time. When the matter was first here, we held that the appellees had engaged in a broad conspiracy in violation of the antitrust laws and that their unlawful acts had injured National Farmers' Organization, Inc. (NFO). We remanded the matter to the district court with directions to determine the amount of NFO's damage.

On remand, NFO advanced two alternative damage measurement theories. Under a "market structure theory", NFO claimed damages of $18,490,694, trebled to $55,-472,082. Under a "test market theory", it claimed damages of $7,403,374, trebled to

---

* The Honorable C. ARLEN BEAM, United States District Judge for the District of Nebraska, sitting by designation.

$22,210,122. The district court refused to award any damages, and NFO again appeals.

We reaffirm our holding that NFO incurred substantial damages as a result of appellees' unlawful acts. We provide more specific directions to the district court with respect to the computation of damages and remand to it for that computation. We also direct the district court to determine and award appropriate attorney's fees and costs. We affirm the district court's denial of certain injunctive relief and its denial of class certification.

I. Background

This action returns to the Court more than five years after we remanded it to the district court and more than seventeen years after it was commenced. The district court conducted the original trial in three phases. Phase I involved claims brought by Mid–America Dairymen, Inc. (Mid–Am) against NFO for violation of state and federal antitrust laws. Phase II involved NFO's counterclaims against Mid–Am, Associated Milk Producers, Inc. (AMPI), Central Milk Producers Cooperative (CMPC) and Associated Reserve Standby Pool Cooperative (ARSPC) for violations of the federal antitrust laws. Phase III involved AMPI's claims against NFO and nineteen individual NFO members for violation of the federal antitrust laws and certain provisions of the Agricultural Fair Practices Act of 1967, 7 U.S.C. § 2303(c), (e) and (f). In an exhaustive 147–page opinion, the district court found in favor of NFO on the phase I and III claims and against NFO on the phase II claims. *In Re Midwest Milk Monopolization Litigation,* 510 F.Supp. 381 (W.D.Mo.1981) (NFO I).

On appeal, this Court affirmed the district court with respect to the phase I and III claims. *Alexander v. National Farmer's Organization,* 687 F.2d 1173, 1183–90 (8th Cir.1982) (NFO II). With respect

to the phase II claims, we affirmed the district court's findings that NFO failed to present sufficient statistical evidence to support its claims of actual and attempted monopolization, *id.* at 1191–92, and that NFO had not produced sufficient evidence to support a finding of liability on the part of ARSPC arising out of its operation of standby milk pools, *id.* at 1207. We reversed the district court's rejection of the remainder of NFO's claims, however, finding that "AMPI, Mid–Am and CMPC did conspire to monopolize and eliminate competition in the marketing of Grade A raw milk produced in the Midwest, through the use of discriminatory pricing, coercive supply disruptions and threats of similar conduct, as well as bad faith harassment and threats of litigation against independent buyers of NFO milk." *Id.* at 1193.

We found that the conspiracy proved by NFO covered a ten-state midwestern region and had as one of its goals elimination of NFO as a competitor in the marketing of raw Grade A milk.[1] *Id.* at 1193. With respect to the conspiracy element, we found that AMPI and Mid–Am each belonged to the other's organization and effectively divided marketing territories in the Midwest, South and Southwest; that AMPI was a member of CMPC and served as CMPC's marketing agent in Chicago, which area served as a base pricing point for other areas served by Mid–Am; that Mid–Am and AMPI officials met from time to time to discuss their concerns regarding NFO; and that, at one point, senior officials of CMPC, Mid–Am and AMPI held a joint meeting to discuss problems created by NFO's lower prices and successful solicitation of their members. *Id.* at 1194–95.

In examining specific overt acts of AMPI, Mid–Am and CMPC in furtherance of the conspiracy, we set forth examples of conduct which, viewed in the context of the entire record, "demonstrate[d] concerted,

1. Our opinion stated:
 NFO made a more than adequate showing of the ten-state region within which the defendants engaged in efforts to gain control over and eliminate NFO as a competitor in the marketing of raw Grade A milk. NFO has

 also demonstrated that the conspiracy affects a substantial amount of interstate commerce —millions of pounds of Grade A milk shipments alone.
 *NFO II,* 687 F.2d at 1193.

unlawful tactics." *Id.* at 1207. The examples included the following.

### A. *The Gandy Dairy Matter (Supply Cut-offs and Limitations)*

Prior to May of 1971, Gandy Dairy, of Central West Texas, purchased all of its milk from AMPI. In March and April of 1971, however, Gandy agreed to buy some milk from independent suppliers. On the day the shipments from the independents began, AMPI began "short shipping" and making late deliveries of milk to Gandy. At the same time, AMPI began soliciting Gandy's customers and offering them direct shipments of competing products at prices near Gandy's cost of production. The avowed purpose of this conduct was to force Gandy to return to AMPI for its full requirements of milk. This Court found AMPI's conduct "blatantly predatory." *Id.* at 1196.

### B. *The Wanzer Dairy Matter (Discriminatory Pricing)*

Since the Chicago area served as a base pricing point for other areas to the south and west, appellees sought to maintain an elevated price in it. In 1970, however, CMPC's price was being undermined by Wanzer Dairy's purchases of non-CMPC milk at lower prices. In response to the purchases, AMDI, a major trade association of proprietary milk buyers in Chicago, met with CMPC and demanded that it drop its price so long as Wanzer was able to obtain milk at a lower price. CMPC complied with the request. At the same time, however, CMPC announced a new price structure, imposing additional charges on any buyer taking less than all of its requirements from CMPC. Later in 1970, after several independent marketers who had previously supplied Wanzer joined CMPC, CMPC again raised prices to buyers taking less than all of their requirements from it. The price increase was especially harmful to Wanzer because it could not fulfill its milk requirements without purchasing some milk from CMPC.

Notwithstanding the price pressure, Wanzer continued to purchase milk from independents, aided to some degree by NFO's offer to reimburse Wanzer for some of the additional charges. In response, AMDI dealers met with CMPC and renewed their objections to paying the CMPC price while Wanzer was obtaining cheaper supplies of milk. After this meeting, CMPC sent a letter to Wanzer threatening to discontinue all milk shipments in five days because "we have become aware that you have been engaged with others in unlawful attempts to interfere with producers whose milk is subject to effective marketing agreements with CMPC and its members." A short time after the letter, Wanzer entered into a one-year committed supply contract with CMPC. CMPC then met with the AMDI dealers, informed them of the Wanzer contract, and reinstated its elevated price. *See id.* at 1198.

We concluded that:

[T]he conduct so established is predatory on its face. Our examination of the underlying evidence only confirms that an inference of unlawful purpose must be drawn. It was clear error for the district court not to find that the pricing scheme was unlawfully discriminatory and that the threatened supply cutoff was unlawfully coercive.

*Id.* at 1199.

### C. *Beatrice Dairy (Sham Litigation or Threats of Sham Litigation)*

In July of 1970, Beatrice Dairy of Fort Worth, Texas, began buying milk from NFO. By February of 1971, it was buying several million pounds of NFO milk per month. By early 1971, Mid–Am had advised Beatrice that it thought NFO's marketing was illegal and that it had the exclusive right to market some of the milk NFO was selling to Beatrice. Mid–Am later met with Beatrice and threatened legal action unless it was paid for the disputed milk. In March of 1971, Mid–Am sued Beatrice and NFO. Thereafter, Beatrice notified NFO that, due to the dispute and NFO's refusal to indemnify it for losses as a result of Mid–Am's action, it was immediately terminating purchases from NFO.

In summarizing the evidence with respect to the Beatrice sham litigation claim and rejecting the appellees' theory that NFO's injuries were self-inflicted, we stated:

> Both Mid–Am and AMPI contend that Beatrice's cutoff of NFO was a unilateral, uncoerced business judgment based upon price and quality considerations.... The termination letter itself and contemporaneous deposition testimony of the Beatrice officials involved in the decision leave no doubt that the acute factor behind the cutoff was Mid–Am's legal claim.... Whatever price or other problems may have accompanied NFO milk, the undisputed facts are that Beatrice purchased an ever-increasing volume of such milk continuing right up to the sudden cutoff, which came twelve days after Mid–Am filed suit against Beatrice. In view of the timing and other contemporaneous evidence and the fact that the cutoff was made in consultation with Beatrice's legal department, there is simply no doubt that the Mid–Am litigation was a material cause of the cutoff.

*Id.* at 1202 n. 34.

### D. *Other Acts*

Our prior opinion listed examples of other incidents and actions which could, in the totality of the circumstances, only be viewed as unlawfully aimed at eliminating NFO as a competitor. Among these actions were: Mid–Am's refusal to deal with NFO members who wished to terminate their relationship with Mid–Am regardless of the members' right to terminate, and Mid–Am's firing of a contract hauler for engaging in activities helpful to NFO. *Id.* at 1204–05.

Viewing the record as a whole, we found that the appellees engaged in a broad conspiracy to monopolize the marketing of Grade A milk in a ten-state region by engaging in:

> [a] series of unlawful acts ... aimed at eliminating independent sales of milk in general and NFO in particular, including

discriminatory pricing and actual or threatened supply cutoffs, litigation and similar harassment. *Id.* at 1207–08.

In addition, we found that the appellees' unlawful conspiracy was a material cause of substantial injury to NFO. *Id.* at 1210. Accordingly, we remanded to the district court with directions to it to determine the amount of damages to which NFO was entitled and set forth guidelines to be used in that determination. *Id.* at 1208. The guidelines included the following:

(1) Because NFO is a nonprofit entity which distributes sales proceeds to members after deducting marketing expenses and its net revenues were tied to sales volume and not to price, NFO could not recover the difference between the price it would have obtained but for the conspiracy and the price it actually obtained. Such a price differential, we held, belonged to its members—not to NFO.

(2) Because the appellees' unlawful conduct caused NFO to lose both members and marketing volume, NFO could recover for losses of membership dues and checkoff fees.

(3) Because NFO had clearly established the fact of injury,[2] the district court had broad latitude in assessing the amount of damages. *Id.* at 1210.

On remand, the district court afforded NFO the opportunity to present additional evidence in support of its damage claim. NFO expressly declined to do so, choosing instead to rely upon the damage theories and supporting evidence it presented at the original trial. *Alexander v. National Farmers' Organization*, 614 F.Supp. 745, 758, 775 (W.D.Mo.1985) (NFO III). After extensive briefing and argument, the district court rejected NFO's damage claims in their entirety. *Id.* at 792–93, 795, 799. In our view, it erred in so doing. Thus, although this matter has already consumed months of the district court's time, we have no alternative but to remand for an award

2. This opinion shall use the term "fact of injury" to denote the presence of a violation that was a material cause of at least some injury.

of damages consistent with the detailed instructions set forth herein.

## II. NFO's Damage Theory

■ NFO introduced two alternative damage theories at trial, primarily through the testimony of its damage expert, Robert R. Nathan. The theories were both used to estimate NFO's lost dues and checkoff fees. The theories were described as the "test market" and "market structure" approaches. The district court rejected both theories, finding that "Nathan's testimony and NFO's damage exhibits adduced in connection therewith cannot be accepted as credible under all the circumstances of this case." *NFO III*, at 792. Accordingly, the court concluded that "a just and reasonable estimate of NFO's alleged lost market penetration damages cannot be made on any credible relevant data adduced by NFO." *Id.* at 793. We affirm the district court's rejection of the market structure theory.[3] With respect to the test market theory, however, we hold that it is a proper basis for a substantial damage award.

■ Preliminarily, we note that the district court appears to have used an inappropriate legal standard in rejecting Nathan's testimony and NFO's damage exhibits. In order to recover damages, NFO had to show: (1) that the appellees violated the antitrust laws; (2) that the violation caused it injury; (3) that the injury was of a type sought to be prevented by the antitrust laws;[4] and (4) the amount of its injury.

3. The market structure theory, under which NFO claimed some $18,490,694 in actual damages, trebled to $55,472,082, is not derived from NFO's actual performance on any order or in any market but assumes that NFO would have attained the share of an average sized major participant on each damage order in terms of milk pooled.

Computing its damages under the market structure approach, NFO defined a major firm on the damage orders as one accounting for five percent or more of the milk pooled on an order. It then requested the USDA to determine the number of pooling firms on each order meeting its definition of major and the combined market share of those firms. *See* NFO Trial Exhibit No. 1014. Using this information, NFO determined its assumed market share by dividing the combined market share of the major pooling firms by the number of such firms on each order (including NFO). From this computation, NFO derived the following projected market share on each damage order: Order 30, 11.57%; Order 60, 11.26%; Order 61, 16.49%; Order 62, 46.33%; Order 64, 31.99%; Order 65, 31.86%; Order 68, 14.89%; Order 73, 48.11%; Order 106, 33.20%; Order 126, 21.14%.

The district court held that the record simply does not support the market structure theory. Our review of the record indicates that the strongest evidence tending to support the theory is testimony that the tendency in all industries, and particularly in milk marketing, is to have a small number of large firms competing amongst themselves and a large number of small firms competing amongst themselves. From this basic premise, NFO's damage expert reasoned,

[i]f you have a limited number of major firms and a new entrant possesses capability and experience to become a major firm, the competition will primarily focus between that new entrant with the capability of being a major firm and the other major firms rather than with a small firm. Therefore, I think it is appropriate to conclude that the new entrant with the capability of being a major firm will tend to compete with and participate in that segment of the market which is accounted for by the major firms.

Trial Transcript at 9641.

Such an assumption, however, even if accepted, does not provide a basis for concluding that NFO would have attained a share equivalent to that of a hypothetical average major firm on each order. Therefore, the record simply will not support NFO's proffered damage computations based on the market structure theory. Accordingly, we affirm the district court's rejection of the market structure theory.

In addition, we note that, with respect to the relative accuracy of the market structure and test market theories, NFO's damage expert testified that the test market approach would tend to understate the damages and that the market structure approach, given the larger figures, would be subject to greater error. Therefore, the expert testified that the average of the two probably represents the best estimate of NFO's damage. *See* Trial Transcript at 9733–35. Our rejection of the market structure theory as unsupported by the record, however, also necessitates rejection of the average, based in part on that theory.

4. With respect to standing, our prior opinion stated:

As NFO's market penetration grew, it earned net revenues in the form of membership dues and checkoff fees from those who marketed milk through NFO. Losses of such dues and fees, to the extent attributable to the defendants' unlawful conduct, represent direct injury to NFO in its "business or property." It is axiomatic that a competitor directly injured from such a conspiracy is a real party in

*See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123–25, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969); *McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1378 (8th Cir.1983), *cert. denied,* 469 U.S. 870, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984); Von Kalinowski, 10 Antitrust Laws and Trade Regulation §§ 115.03, 115.04.

While the first three of these elements must be established by a preponderance of the evidence, a lesser standard of proof is applicable to proof of the *amount* of damage. *See, e.g., J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) (distinguishing higher standard of proof for establishing *fact* of injury from lower standard of proof for establishing *amount* of damage); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931) (same).

■ This lower standard derives from the principle that a wrongdoer should not profit from the harm occasioned by its act. *See, e.g., Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264–66, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."), *quoted in J. Truett Payne Co.,* 451 U.S. at 566, 101 S.Ct. at 1929; *see also Story Parchment Co.,* 282 U.S. at 563, 51 S.Ct. at 250 ("[I]t would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.") Therefore, in proving the *amount*

of damage, the antitrust plaintiff need only present evidence from which the fact finder may make a just and reasonable estimate of the damage that is not based on speculation or guesswork. *J. Truett Payne Co.,* 451 U.S. at 566–68, 101 S.Ct. at 1929–30; *Zenith Radio Corp.,* 395 U.S. at 124, 89 S.Ct. at 1577; *Bigelow,* 327 U.S. at 264, 66 S.Ct. at 579; *Story Parchment Co.,* 282 U.S. at 563, 51 S.Ct. at 250.[5]

Applying the standard, the Supreme Court has recognized that "the vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation," *J. Truett Payne Co.,* 451 U.S. at 566, 101 S.Ct. at 1929, and has admonished the courts to "observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market." *Zenith Radio Corp.,* 395 U.S. at 123, 89 S.Ct. at 1576. The Court has acknowledged that "[a]ny other rule ... would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain." *Zenith Radio Corp.,* 395 U.S. at 124, 89 S.Ct. at 1577.

Appellees contend that this Court's prior opinion established only that they engaged in unlawful conduct, leaving issues of causation to be determined on remand. We disagree. The opinion is clear that NFO established the fact of injury, that is, antitrust violations by the appellees which were a material cause of some injury to its

---

interest and has a sufficient personal stake in the outcome to have standing to assert an antitrust claim.

*NFO II,* 687 F.2d at 1209 (footnote omitted).
On remand, the appellees again raised a challenge to NFO's standing, arguing that *Associated General Contractors v. Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), and this Court's application of that case in *McDonald v. Johnson & Johnson,* 722 F.2d 1370 (8th Cir. 1983), *cert. denied,* 469 U.S. 870, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984), changed the law of antitrust standing so as to preclude recovery by NFO. The district court disagreed, finding that NFO had standing to assert the dues and check-

off claims. *NFO III,* 614 F.Supp. at 751. We affirm the district court in this regard.

5. *See also Rose Confections, Inc. v. Ambrosia Chocolate Co.,* 816 F.2d 381, 393 (8th Cir.1987); *MCI Communications v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1161 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Rosebrough Monument Co. v. Memorial Park Cemetery Association,* 666 F.2d 1130, 1146 (8th Cir.1981), *cert. denied,* 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982); *Agrashell, Inc. v. Hammons Products Co.,* 479 F.2d 269, 283 (8th Cir.), *cert. denied,* 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973).

business or property. *See NFO II*, 687 F.2d at 1210 ("Because the fact of injury is unmistakable on this record, the district court has rather broad latitude in assessing the amount of damages which NFO shall recover.")

Specifically, we cited examples of the appellees' unlawful conduct which caused injury to NFO. Among these were: CMPC's conduct with respect to Wanzer dairy,[6] Mid–Am's unlawful threats of litigation against Beatrice dairy,[7] and Mid–Am's and AMPI's conduct with respect to Foremost Dairy.[8]

Since our prior opinion clearly established the fact of injury to NFO, the district court on remand should have separately and independently examined the damage evidence put forward at trial by NFO in light of the lesser standard of proof applicable to determining the amount of damages. Instead, the district court rejected the evidence in its entirety because certain portions of it rested upon proposed findings the court rejected in the liability phase of the case. Such a practice, in effect, ignores the lesser standard of proof applicable to the amount of damages.

Moreover, in light of our prior opinion and the damage evidence adduced by the parties, even if the district court's review had not been so tainted, its finding that NFO offered insufficient proof to recover any damages would be clearly erroneous. As we point out below, NFO's damage evidence, while not perfect, clearly establishes the basis for a significant award. It is to this basis that we now turn.

## A. *The Test Market Theory*

Under the test market theory, NFO sought to use its performance in an identifiable portion of the relevant market as a "yardstick" to measure its performance in the remainder of the market.[9] NFO chose as its yardstick measure its performance in federal milk market order number 68, a market order encompassing Minneapolis and St. Paul, Minnesota, and the surrounding area.

After selecting the order, NFO obtained from the United States Department of Agriculture (USDA) the total volume of milk pooled on it in each month for the years 1971 to 1975 and the total volume of milk pooled by NFO on it during the same

---

**6.** This Court stated:

In our view, this record sufficiently establishes the fact of injury to NFO, such that the extent of harm and precise effect of the Wanzer contract go only to the question of the amount of damages.

*NFO II*, 687 F.2d at 1199 n. 29.

**7.** This Court stated:

In view of the timing and other contemporaneous evidence and the fact that the cutoff was made in consultation with Beatrice's legal department, there is simply no doubt that the Mid–Am litigation was a material cause of the cutoff.

*NFO II*, 687 F.2d at 1202.

**8.** This Court stated:

Foremost's "objective" decision to reject [a shipment of NFO milk] was pervaded by Mid–Am's litigation tactics against buyers of NFO milk and AMPI's prior reprisals for independent purchases. The only real dispute in the record is over which of these factors was more dominant in Foremost's decision.

Viewed in the larger context of the overall conduct engaged in by those co-ops, the Foremost incident gives rise to only one conclu-

sion: NFO was caught in a whipsaw created by the coercive conduct of AMPI and Mid–Am toward buyers of independent milk in general, and of NFO milk in particular.

*NFO II*, 687 F.2d at 1204.

**9.** In discussing markets it is important to note that the relevant geographic market was found in our prior opinion to encompass a ten-state area in the midwestern United States. *NFO II*, 687 at 1193. This geographic damage market is distinct from the various regions in which, by federal regulation, milk is pooled and distributed. Such regions are commonly referred to as "market orders." For example, the region NFO seeks to use as a "test market" encompassed Minneapolis and St. Paul, Minnesota, and surrounding areas, and was denominated federal market order number 68. The market orders are relevant to this case because reliable statistics concerning milk marketing in the relevant geographic market are available only for each federal market order. Since milk producers in the geographic damage market primarily pooled milk on ten federal market orders, NFO properly concentrated its damage estimates on these ten orders. Throughout the remainder of this opinion, the ten orders will be referred to as the *damage orders.*

period.[10] From these figures NFO derived its monthly percentage market share on the order. This computation yielded a 10.5 percent share for 1973. NFO used this 10.5 percent share as a basis for estimating its lost checkoff fees and membership dues on the damage orders.

Appellees contend that the test market theory does not provide a sufficient basis to support NFO's damage claim. The validity of the theory turns primarily on whether the relevant conditions in the other damage orders sufficiently resemble the conditions in order number 68—the proposed test order (or "yardstick measure") —that extrapolation of NFO's performance to the other damage orders will provide a just and reasonable estimate of NFO's damage.

This Court has previously accepted the use of a yardstick measurement in determining the amount of antitrust damages. In *Agrashell, Inc. v. Hammons Products Co.*, 479 F.2d 269 (8th Cir.1973), this Court approved a yardstick measurement of the plaintiff's (Hammons') damages for its alleged "failure to grow." The plaintiff's damage expert testified that he chose as the yardstick measure a portion of the relevant market where the defendant's antitrust violations were not prevalent.

This Court acknowledged that the expert's yardstick measurement had many defects, including that the test area had only one customer in it, that other customers almost always purchased smaller volumes, and that the test area customer may not have viewed the plaintiff's and defendant's products as interchangeable. In addition, the Court noted that the plaintiff's damage expert acknowledged he had not considered whether companies other than the defendant sold similar products, or the impact of such sales. Finally, the Court noted the expert offered no support for the position that the test area was relatively unaffected by the defendant's unlawful conduct.[11] Despite these defects, the Court found, as a matter of law, that the expert's testimony sufficiently proved the amount of damage, citing the principles set down by the Supreme Court in such cases as *Zenith Radio Corp.* and *Bigelow. Id.* at 283.

Similarly, NFO's yardstick measurement is not perfect. The record contains evidence that the order was unique in several respects, including its location in a surplus production area and the fact that a greater number of facilities existed in the area to handle that surplus. In addition, NFO enjoyed a relatively strong membership base on the order.[12] Finally, as the district court highlighted in its decision, there is evidence in the record that dairy production in Minnesota grew at a faster rate than in the rest of the nation. NFO responds that milk pooled on order 68 comes from places other than Minnesota and that the growth of Minnesota production does not destroy the comparability of the order.[13]

---

10. The total milk volume figures were taken from the United States Department of Agriculture publication *Federal Milk Order Market Statistics Annual Summaries 1971–1975.* The volume of NFO milk pooled was compiled by the United States Department of Agriculture's Agricultural Marketing Service. See NFO Trial Exhibit No. 1225.

11. In addition, two of the four claims of unlawful conduct on which the expert based his damage theory were eventually rejected. *Agrashell, Inc.*, 479 F.2d at 283.

12. NFO trial exhibit number 1023 reveals that NFO estimated its 1969 membership on each damage order as follows: Order 30, 7.1%; Order 60, 11.0%; Order 61, 10.4%; Order 62, 6.8%; Order 64, 7.1%; Order 65, 7.4%; Order 68, 8.8%; Order 73, 6.1%; Order 106, 2.9%; Order 126, 3.0%.

13. It is interesting that both NFO and the appellees adopt different views of the nature of federal orders depending upon the context. For example, in arguing that a federal order is an appropriate unit as a yardstick measure, NFO emphasizes the degree to which milk marketed on an order normally comes from producers located within that order. On the other hand, faced with the relatively rapid growth of dairy production in order 68, NFO emphasizes the large amount of milk pooled on the order that comes from outside its borders. The appellees, for their part, argue that order 68 is not a valid yardstick because its liberal pooling provisions allow milk from outside of the order to be pooled with regularity. They also argue, however, that the rapid growth of production within the geographical boundaries of the order makes it unsuitable as a yardstick measure.

Probably the most troublesome criticism of the use of order 68 as a yardstick, however, is the implication that the liberal pooling provisions applicable on the order allowed NFO to pool large quantities of milk on it in order to artificially inflate its performance.[14] Yet, whatever the merit of this contention, the record does not disclose that the appellees ever presented any evidence from which the district court could have reduced the yardstick measurement. The only suggestion was that the court should entirely ignore NFO's performance in order 68. Such a course cannot be sustained.

For all of the shortcomings of the order as a yardstick measurement, the undeniable fact is that NFO actually managed to pool a 10.5 percent share on it over the entire year in 1973. In addition, review of this Court's prior opinion indicates that the order was not free from the appellees' unlawful acts and that NFO might have pooled an even larger share had it not been for these acts. Specifically, this Court cited Mid–Am's threat of litigation against Cloverleaf Creamery, a dairy located in order 68, as corroborating other evidence establishing a pattern of conduct involving threats of sham litigation. *See NFO II,* 687 F.2d at 1202 n. 33. Moreover, even if order 68 had been free of unlawful conduct by the appellees, it cannot be presumed that the appellees' unlawful conduct elsewhere would have had no "spillover" effect onto the order. Thus, to the extent that the appellees' unlawful acts restricted NFO's efforts in order 68, its use would tend to underestimate NFO's damages.

There are also factors indicating that order 68 was comparable to the other damage orders. Most significantly, as in *Zenith Radio Corp.,* the relevant product and seller were the same in the test market area as in the damage area. In addition, with the exception of pooling provisions, it appears that the federal regulations applicable to the federal orders are substantially similar.

Finally, we note that the appellees offered no reasonable substitute yardstick measurement. Instead, the record reflects that the appellees' strategy at trial was to present only evidence which tended to show NFO had not been injured at all. To this end, they presented testimony of Dr. Babb and George Hansen, comparing, for the years 1970–77, NFO's performance on the damage orders with its performance on 19 non-damage orders. According to the testimony, because NFO performed as well or better on the damage orders as on the non-damage orders, it was not injured at all by the appellees' unlawful acts.

The study, however, is fatally defective in a number of respects. Most importantly, it is clear that NFO's dairy marketing efforts were focused in the Midwest, the area where its membership base was the strongest.[15] Thus, one would expect NFO

---

14. The testimony of the appellees' damage expert, Dr. Babb, reveals the following:

Q Would you look at NFO exhibit 1016, please?

\* \* \* \* \* \*

Q What does it purport to show, to your understanding?
A It shows the actual volumes of milk pooled by NFO for the years 1970 through 1980.
Q With respect to old Order 68, does it show a higher or lower or what proportionate share compared to other orders, and considering the size of old Order 68?
A It shows that NFO marketed milk in Order 68 starting in 1971. And in 1971 and 1972 and 1973 it did not pool any of its producers in the Minnesota–North Dakota Order or in the Southeast Minnesota–Northern Iowa Order.
Q Are those adjacent orders to Order 68?

A They are.

\* \* \* \* \* \*

Q If one wanted to design a test market, would it be possible, under the Federal Order provision, to your knowledge, to pool an unusual amount of milk for producers on a particular Federal Order, particularly with reference to old Order 68?
A The old Order 68 had somewhat more liberal pool provisions, pool plant provisions compared to other orders in the U.S. These pool plant provisions I believe were made effective in 1972. The pool plant provisions of the current upper Midwest Order, which became effective I believe in June of '76, are even somewhat more liberal.
Trial Transcript at 14,456–57.

15. Review of the testimony of various NFO officials indicates that the focus of NFO's dairy program was the ten-state midwestern damage area.

to make its strongest showing in that area. The fact that it did so despite the appellees' unlawful practices does not mean that NFO suffered no damage. Indeed, NFO's relative success in the face of the numerous unlawful acts of the appellees is an indication of NFO's capability in a violation-free market.[16] In addition, the appellees made no showing of comparability of the non-damage markets. Finally, the conclusion to be drawn from the appellees' damage theory—that NFO suffered no damages at all from the unlawful conduct—is fundamentally at odds with this Court's prior opinion which established that NFO had suffered at least *some* damage as a result of the unlawful conspiracy.

▇ In sum, we recognize that NFO's test market theory is not perfect. Nonetheless, in light of the Supreme Court's repeated admonition that it does not " 'come with very good grace' for the wrongdoer to insist upon specific proof of the injury which it has itself inflicted," *J. Truett Payne Co.*, 451 U.S. at 566–67, 101 S.Ct. 1929 at 1929 (quoting *Hetzel v. Baltimore & Ohio R. Co.*, 169 U.S. 26, 18 S.Ct. 255, 42 L.Ed. 648 (1898)), we hold that the Federal Market Order 68 is sufficiently comparable to the other damage orders that extrapolation of NFO's performance on that order to the other damage orders will provide a just and reasonable estimate of NFO's damage.

Using the 10.5 percent share it achieved on order 68 as a yardstick against which to measure its performance on the remaining damage markets, NFO presented evidence relating to elements of its damage claim expressly approved of in our prior opin-

---

For example, Al Scott, an assistant director of NFO's dairy program, testified:

Q During the early years of the NFO dairy program, was the program more active or more focused in any particular geographic area?

\* \* \* \* \* \*

A Our focal point at that time was throughout the Midwest. It was the midwestern states.

Q What do you mean when you say "Midwest"?

A Well, Wisconsin, Minnesota, Iowa, Missouri, Illinois, Kansas, Nebraska. This would be the primary area.

Trial Transcript at 2548.

In addition, Oren Staley, director of NFO, testified:

Q Did there come a time, Mr. Staley, when NFO started to establish plans for the direct marketing of Grade A milk?

A Yes.

Q And when was that?

A In 1969, late 1969.

\* \* \* \* \* \*

Q In your planning, where did you plan to go into the direct marketing of Grade A milk?

A We ha[d] the most interest in the early discussions in Southwest Missouri and Wisconsin. So that is where we decided to start.

Q Did you have any plans to go beyond that?

A Yes. But we were going to get our experience in those and then move rapidly over the rest of the area.

Q You said "the rest of the area" in your answer. What do you mean by that?

A Well, at that point, the area would have been the heart of the Midwest where our organization was the strongest. That is the place where we would go.

Q What states does that include?

A This would have included at that time Wisconsin, Minnesota, Iowa, Missouri, Illinois and Kansas and Nebraska. It may have been some in Arkansas. Basically it was those states.

Q How soon did you plan to get into marketing in those states?

A Well, the first thing was to find the markets, and as soon as we found the markets, the availability, that we could report back to the members that here was a market that was available, and then we worked with the counties at that point of saying this is it, this is how much milk we need, and you put it together with your neighbors, and then establish the routes and the reloads. All those are to be a combination, but starting off with the interests of the members and the markets.

Q How long after you had the experience in Southwest Missouri and Wisconsin did you expect to go into those other areas?

\* \* \* \* \* \*

A Well, everything that we have done, we always hope it to be just a matter of weeks. We certainly would expect to have been done within a matter of months, six or eight months, covering the Midwest.

Trial Transcript at 1697–1700.

16. *Cf. Agrashell, Inc.*, 479 F.2d at 280, in which this Court reviewed a damage award based, not on the premise that the plaintiff lost business but, upon the premise that the defendant's unlawful acts deprived the plaintiff of business it should have had. We upheld the award, despite the fact that the both the plaintiff's and the defendant's businesses prospered during the damage period.

ion—lost checkoff proceeds and lost membership dues.

### B. *Checkoff Proceeds*

■ NFO paid its member producers the proceeds from sales of their production, less a marketing fee (ordinarily measured in cents per hundredweight of milk handled). This marketing fee is referred to as a "checkoff." [17] *See NFO II,* 687 F.2d at 1208. NFO's lost checkoff fee calculation involved estimating the additional volume of milk it would have marketed absent the restrictive practices, multiplying that volume by the checkoff fee it would have obtained, and deducting the extra expense it would have incurred in handling the extra volume.

In order to estimate the additional volume of milk it would have marketed absent the restrictive practices, NFO first obtained from the USDA a summary of the total milk pooled on each market order. Next, it multiplied the total volume of milk pooled on each order by the 10.5 percent yardstick measure to obtain the volume of milk it would have pooled absent the restrictive practices. Finally, NFO subtracted from that volume the volume of milk it actually pooled on each order to arrive at the total additional volume it would have marketed.[18]

Once NFO had computed this additional volume of milk, it could determine the amount of its damages by multiplying the volume by the three cents per hundred-

weight checkoff it received on all milk marketed during the damage period.[19]

The appellees object to NFO's checkoff computation on the ground that the three cent per hundredweight figure represents NFO's gross losses and does not include expenses associated with marketing the additional volume of milk. NFO trial exhibit numbers 1003 and 1004, however, summarize the additional expenses associated with NFO's achievement of the 10.5% percent share on the damage orders. While the expenses associated with the additional volumes of milk and with collecting the checkoff were not deducted from the basic checkoff figures, we note that they were deducted from a separate claim for bargaining expense checkoff fees.[20] We can see no reason to require NFO to twice deduct such expenses from its damage claim.

In addition, the appellees argue that the checkoff computation overstates NFO's losses because it fails to take into account NFO member dairy producers who did not market their milk through NFO but who, nonetheless, voluntarily contributed the three cent checkoff to NFO. They contend that NFO member milk producers are not required to market through NFO and that a number of NFO producer members chose to market their milk by some other means (including through one of the appellees). Therefore, to the extent that some NFO members who did not market through NFO voluntarily paid NFO the three cent per

**17.** Our prior opinion recognized that:
Those who directly suffered price reduction damages are individual farmers, but NFO cannot recover the measure of their injury—it can only recover for its direct injury.
*Alexander v. National Farmers Organization, NFO II,* 687 F.2d at 1209.

**18.** For example, on order number 30 (encompassing Chicago, Illinois, and surrounding areas) for the year 1974, 81,492,152 hundredweight of milk was marketed. NFO estimates that absent unlawful restraints, it would have marketed 10.5% of that total, or 8,556,676 hundredweight. *See* NFO Trial Exhibit No. 1015. In order to determine the volume lost, NFO next subtracted from the volume it estimated it would have pooled, the volume of milk it actually pooled, or 3,213,850 hundredweight. *See* NFO Trial Exhibit No. 1016. Thus, NFO esti-

mated its lost volume at 5,342,826 hundredweight (8,556,676—3,213,850). *See* NFO Trial Exhibit No. 1017.

**19.** The record contains ample evidence as to the fact that the customary checkoff fee was three cents per hundredweight during the entire damage period. *See* Trial Transcript at 6447 (testimony of Donald Berkhahn); Trial Transcript at 7980 (testimony of Gene Potter); Trial Transcript at 8651 (testimony of Dennis Hurley).

**20.** The additional expenses were for such items as salary for additional personnel, travel, taxes, insurance, and other miscellaneous items. *See* NFO Trial Exhibits Numbers 1003 (summarizing accounting expenses), 1004 (summarizing other expenses), 1007–11 (summarizing calculation of additional expenses).

hundredweight checkoff, the damage claim is inflated.

The record indicates that NFO received the three cent checkoff from a number of its members who did not market through NFO and that this number was more than de minimis.[21] It does not, however, indicate whether the voluntary contributors pooled milk on any of the damage orders or the volumes they pooled. The question whether the voluntary contributors pooled milk on the damage orders is particularly important because, to the extent they pooled milk elsewhere, their voluntary contributions should not reduce the damage award. In other words, the fact that an NFO member pooled milk through another marketing organization yet voluntarily contributed a checkoff fee to NFO, is only relevant if the milk on which the contribution was made was pooled on one of the damage orders.

Accordingly, NFO's failure to include voluntary contributions in its damage calculation is not a basis for totally rejecting it. Instead, NFO should be given an opportunity on remand to point out to the district court, from the *existing record,* evidence which will permit the court to make a reasonable approximation of the amount voluntarily contributed to NFO via the three cent checkoff from its members pooling milk on the damage orders who did not market milk through it.[22]

### C. *Membership Dues*

■ In addition to lost checkoff fees, our prior opinion recognized that NFO is entitled to recover membership dues for those members it would have added absent the restrictive practices. *NFO II,* 687 F.2d at 1209. Computing these dues, NFO first obtained from the USDA the yearly total of the number of producers pooling milk on each damage order. It then multiplied the total by the 10.5 percent yardstick measurement. This yielded an estimate of the number of producers NFO would have pooled in each year. *See* NFO Trial Exhibit No. 1024. NFO then subtracted from this number the greater of the actual number of producers it pooled on each order or the estimated number of NFO producer-members on each order[23] to arrive at a

---

**21.** Ricardo Avila, an assistant director of NFO's dairy program testified on cross examination as follows:

> Q Now, Mr. Avila, do you know that in about 1973, approximately 1,700 dairy farmers were sending in check-off to the NFO even though they were not marketing through the NFO?
> A I believe I did. I believe I asked my secretary to put those figures together for me.
> Q Do you recall how many dairy farmers you determined were sending in their check-off to the NFO in 1974, even though they marketed their milk elsewhere?
> A If my memory is correct, I believe it was 254.
> Q Dairy farmers *in the whole country* or plants?
> A Dairy farmers.
> Q Is it your testimony that the number dropped from 1,700 in 1973 to 254 in 1974?
> A Whether it was '74 or '75, I don't recall. I do remember asking the secretary to put those figures together for me.

Trial Transcript at 4287–88 (emphasis added).
In addition, Albert Scott, another assistant director with NFO, testified as follows:

> Q [Y]ou also know that there are dairy farmers who market through marketing cooperatives who pay their dues to NFO, don't you?
> A Yes.

> Q And you know that there are dairy farmers, Grade A dairy farmers, who market through existing cooperatives who give a voluntary three-cent checkoff to the NFO, don't you?
> A There are some, yes.

Trial Transcript at 2809.

**22.** If such information in the record is not identified, the district court would be justified in reducing the checkoff claim by an amount inferable from the existing record. For example, absent other evidence, a reasonable inference would be that all of the 1,700 contributors identified in the trial transcript at pages 4287–88 pooled milk on the damage orders. In addition, if the volume of milk these producers pooled is not identifiable, a reasonable inference would be that each of the voluntary contributors pooled an amount of milk equal to the average volume pooled by a producer in the relevant area.

**23.** NFO purposely understated its damage figure by assuming that all existing NFO members who were dairy producers on a given order would market their milk with NFO (be "recaptured") before any non-member producers would do so. That is, in computing the number of "lost producers," the existing base of NFO members was required to be exhausted before any non-member producers were claimed.

conservative estimate of the number of members it would have added absent the restrictive practices.[24] *See* NFO Trial Exhibit Nos. 1025–1034. Lost membership dues were then calculated by multiplying the number of members that would have been added by the net dues collected per member in each year.[25]

Appellees challenge NFO's calculation of lost membership dues on a number of grounds. First, as with the checkoff fee, they contend the calculation fails to adequately take into account the costs associated with the additional members. We disagree. Review of the record indicates that NFO deducted from its gross dues figures amounts representing the costs of additional personnel required to process the dues payments, the costs of sending the member an NFO newsletter, and the costs of providing each member with a membership card. *See* NFO Trial Exhibit Number 1006.

The appellees also contend that NFO's lost dues computation is fatally flawed because it assumes that the members NFO lost as a result of the unlawful conspiracy would have paid their dues. The appellees cite the fact that in 1975 NFO was owed nearly $48,000,000 in membership dues as supporting their contention. Thus, they argue it would be erroneous to assume that any members NFO would have added but for the unlawful conspiracy would have met their dues obligations.

Although there is evidence that NFO wrote off a substantial amount of dues receivable as uncollectible, the dues cannot be collected dues unless and until they are owed. Moreover, whatever merit there may be to the proposition that NFO has difficulty collecting dues from its general membership, the appellees made no showing that dairy producers who marketed their milk through NFO similarly failed to

---

This calculation required NFO to calculate the number of dairy producers pooling milk on each order who were also NFO members. The first step in the calculation involved determining NFO membership in each of the damage states. Using a membership list compiled in 1974, NFO estimated its active membership in 1970 (the year in which it made its first major effort to penetrate the damage orders) by removing from the 1974 list those who first became members after 1970 and those who were two years or more delinquent in their dues payments as of 1970. *See* NFO Trial Exhibit No. 1022. Next, NFO obtained from the United States Bureau of the Census the total number of farms in each state in the damage market as of 1969 and, by dividing the total number of farms in each state by the number of NFO members in each state, estimated the percentage of NFO membership in each of the damage market states. *See* NFO Trial Exhibit No. 1022.

Using the membership estimates, NFO calculated the number of its dairy producer members pooling milk on each damage order by obtaining from the USDA a summary of the number of dairy producers from each state pooling milk on each federal market order and multiplying that number by the percentage of NFO membership in each state. (Since NFO had no accessible information as to the percentage of its members in each damage state, or in the organization as a whole, who were dairy producers, it assumed for purposes of this calculation that the proportion of NFO member dairy farmers to the total number of dairy farmers in a state was similar to the proportion of NFO member farmers in a state to the total number of farmers in that state.) *See* NFO Trial Exhibit No. 1023.

As an example of the calculation, in 1969, 2,771 producers from Wisconsin and 1,957 producers from Minnesota pooled milk on market order number 68. NFO estimates that 10.78% of farms in Minnesota and 7.42% of farms in Wisconsin were members of NFO. Multiplying the membership percentages by the number of producers, NFO estimates that 211 NFO member dairy producers from Minnesota (10.78% × 1,957) and 206 member producers from Wisconsin (7.42% × 2,771) pooled milk on order number 68. Since these two states were the sole source of milk pooled on order number 68, NFO estimates that it had 417 dairy producer members pooling milk on order number 68 (211 + 206). *See id.*

24. For example, the record reflects that, on federal market order number 30, a total of 16,990 producers pooled milk. NFO calculated that it would have pooled 1,784 producers absent the restrictive practices (16,990 × 10.5%). Figures from the USDA indicate that NFO actually pooled 574 producers. NFO estimates its membership base on order number 30 at 1,173. Subtracting the greater of the number of actual producers (574) and the estimated membership base (1,173), NFO estimates that it lost 611 members (1,784 − 1,173). *See* NFO Trial Exhibit No. 1025.

25. These net dues ranged from a low of $60.63 in 1973 to a high of $62.20 in 1972. *See* NFO Trial Exhibit Nos. 1025–34.

pay their membership dues.[26] Finally, even if the appellees had made such a showing, it would not properly lead to a complete denial of NFO's dues claim. Instead, the appropriate course would be to reduce the dues claim to reflect the probability that they would not be paid.

The appellees also challenge NFO's calculation of its membership base. First, they challenge the accuracy of the computer tapes from which NFO derived its membership estimate. Second, they contend that the assumption used by NFO to calculate the number of dairy producers on each order who were members of NFO was unreasonable. The assumption was that the proportion of NFO member dairy farmers to the total number of dairy farmers in a state was similar to the proportion of NFO member farmers in a state to the total number of farmers in that state. Third, they challenge NFO's use of a single time period in estimating its membership. They contend that, by limiting the membership calculation to those who were members in 1969, NFO overstated its damages to the extent that producers who joined NFO after that time and did not market their milk through NFO were included in the damage calculation. Fourth, they argue that the lost dues figure is inflated because it assumes that a producer will market milk on only one order.[27]

While each of the appellees' objections in this regard might have merit *in theory* insofar as they point out potential sources of error in NFO's damage calculation, the record is entirely lacking evidence showing *actual* error or evidence from which the award could be reduced to correct any errors. Rather, the appellees contend that the *potential* for error renders the damage evidence unreasonable and speculative. This Court, however, must review the record in light of the Supreme Court's admonition to observe the practical limits of

proof in calculation of the amount of damages. *Zenith Radio Corp.*, 395 U.S. at 123, 51 S.Ct. at 1576; *supra* at 1293. Having done so, it is clear that, in the context of this case, the process by which NFO calculated its lost dues was just and reasonable. Accordingly, we hold that NFO's lost membership dues calculation is a proper element of its damage claim.

### D. *Assumptions*

In addition to evidence concerning checkoff fees and membership dues, NFO presented evidence relating to a number of assumptions necessary to its damage calculation. Among these were assumptions concerning the time NFO would enter the various damage orders, the time it would take NFO to achieve its mature market share on the damage orders, the conditions on certain orders after their mergers, and the conditions on all of the damage orders in the intervening period from completion of the damage calculation to final judgment.

### 1. Time of Entry on Damage Orders

■ NFO's damage calculation reflects its intention to move as rapidly as possible in entering each of the damage orders, yet recognizes that simultaneous and successful entry on all ten damage orders was not likely. Thus, the calculation assumes that NFO either did or would have marketed milk on federal order numbers 30, 62, 64, 106 and 126 beginning in 1970, on federal order numbers 60, 61, 68 and 73 beginning in 1971, and on order number 65 beginning in 1972. NFO's claim includes no damages for any years prior to actual or intended entry on each federal order.

The appellees contend that the dates of NFO's entry on each of the damage orders are erroneous and unsupported by the

**26.** Indeed, our prior opinion recognized that NFO deducted certain marketing expenses from milk sales proceeds paid to its member producers. *NFO II,* 687 F.2d at 1209. From this, one could conclude that, if collection of dairy producer dues became a serious problem, the dues could be deducted from the proceeds of a member's milk sales.

**27.** In this regard, AMPI Trial Exhibit Number 5491 purports to show that in October of 1976, 1,307 of its 4,895 members in an 11–order area pooled milk on more than one federal market order.

record. We disagree. Many of the same portions of the record cited with respect to the focus of NFO's efforts also support its claim as to entry on the damage orders. *See* Trial Transcript at 2548 (testimony of Al Scott); 1697–1700 (testimony of Oren Staley); 6443 (testimony of Donald Berkhahn). In addition, the unlawful acts of the appellees cannot be viewed in isolation from the context in which they occurred. *See NFO II,* 687 F.2d at 1193–94, 1208 (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962)). It is indisputable that the unlawful conspiracy had a damaging effect on NFO's ability to expand as it had intended. Thus, we hold that the assumptions as to the dates NFO would have entered the damage markets are a reasonable element in NFO's damage calculation.[28]

### 2. Time to Achieve Mature Market Share

NFO's damage estimate also reflects the fact that it would not likely achieve its mature market share on each damage order in the same year it began marketing milk on that order. Instead, based on its experience in the test market order (federal order number 68),[29] NFO assumed that it would achieve its mature (10.5%) market share in three years with one-third of the mature share being achieved in each year.[30]

The appellees object to this assumption, arguing that NFO's performance on other market orders does not support it. In essence, the question of time to achieve mature market share is part and parcel of the larger question whether NFO's experience on order 68 may be used as a yardstick against which NFO's performance on the other damage orders may be measured. Therefore, consistent with our holding above that order 68 may reasonably be used as a yardstick, we hold that NFO's assumption, derived from its performance on that order is reasonable and was properly used in its damage computation.

### 3. Combination of Federal Orders and Post Computation Figures

The damage calculation also includes assumptions as to damage orders that were merged with other orders. In 1975, several Texas federal market orders were merged with North Texas order number 126 to create a new federal order number 126. In 1976, federal order numbers 60, 61 and 68 were merged into a new federal order number 68. Since the mergers made calculation of damages on the merged orders nearly impossible, NFO assumed that conditions on each of the merged orders would remain the same as the last year prior to the merger.[31] *See* Trial Transcript at 9697–9700.

---

**28.** Insofar as NFO's assumptions as to dates of entry on the damage orders represent NFO's plans to expand, we note that this Court has stated:

> The Court does not believe that a going concern, which is the victim of an anti-competitive practice, must forego damages for sales it would have made as the result of natural expansion of its business simply because it was victimized early in its existence before its attempts to expand could ripen into evidence of preparedness and intent to increase output.

*TV Signal Co. of Aberdeen v. American Telephone & Telegraph Co.,* 617 F.2d 1302, 1308 (8th Cir.1980) (quoting *Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964, 968 n. 20 (5th Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)).

**29.** For a summary of NFO's share of the milk pooled on order 68 for the years 1971–75, see NFO Trial Exhibit Number 1225.

**30.** For example, using federal order number 30, NFO either would have or did begin pooling milk on that order in 1970. NFO estimates that it would have pooled one-third of its mature market share of 10.5% in the first year, or 2,661,003 hundredweight, two-thirds of the 10.5% market share, or 5,621,516 hundredweight, in the second year, and the full 10.5% market share, or 8,705,792 hundredweight in the third year.

**31.** For example, because federal order number 60 was merged into order number 68 in 1976, NFO assumed that the volume it would have pooled in each of the years subsequent to 1975 would remain at the 1975 level of 409,984 hundredweight. Similarly, NFO assumed that the number of producers it would have pooled on the order, had it continued to exist, would have remained at the 1975 level of 188. *See* NFO Trial Exhibit No. 1015; NFO Trial Exhibit No. 1026.

Similarly, the damage calculation also assumes that conditions on the market orders would remain essentially unchanged after 1977. This assumption provided a method by which NFO could predict the damages it would incur during the interval between completion of its damage calculation and final judgment in the case.[32] Accordingly, because the most recent figures available at the time of the damage calculation were for August of 1977, NFO used 1977 figures in its damage calculations for the three years following 1977, essentially assuming static conditions for the three-year period.[33] *See* Trial Transcript at 9658.

The district court held that the assumptions as to static conditions were unreasonable and not supported by the record. More specifically, the court rejected NFO's contention that the universe of producers from which it would derive its market share was static and found instead that the number of producers in the dairy industry was decreasing. *NFO III*, 614 F.Supp. at 790–91.

The flaw in the district court's approach is that, although the number of producers has decreased over time, the total volume of milk production has increased. In addition, the record reflects that the share of that production marketed by cooperatives has increased. *See* Trial Transcript at 14,-421. Thus, to the extent that NFO's damages rest on the number of producers in the market, its assumption of a static situation may tend to overestimate its actual performance. However, to the extent that its damages rest on volume of milk marketed, its assumption of a static situation would tend to underestimate its actual performance. In any event, viewed as a

whole, the record simply does not support the district court's rejection of NFO's damage evidence in its entirety on the basis of the decreasing number of producers. Accordingly, on remand, the district court shall afford NFO the opportunity to present evidence *on the basis of the existing record* from which its post-combination and postcomputation *membership dues claim* may be reduced to reflect the decrease in the number of producers.[34]

### E. *Adjustments Not Included in the Basic Damage Estimate*

NFO's damage estimate included two elements in addition to checkoff fees and dues. These were bargaining expense checkoff fees and post relief damages.

#### 1. Bargaining Expense Checkoff

■ At various times during the damage period, NFO imposed a bargaining expense checkoff fee in addition to the three-cent per hundredweight basic checkoff fee. This checkoff fee was originally instituted in 1974 at two cents per hundredweight and was increased to six cents per hundredweight in 1976. This checkoff represents an additional element of NFO's claimed damages.

With respect to the two cent per hundredweight bargaining checkoff, NFO's damage calculation contained the assumption that, but for the restrictive practices, it would have imposed the checkoff in early 1972, some two and one-third years earlier than it was actually imposed. Therefore, it claims lost bargaining expense checkoff damages, not only for the additional milk it would have marketed absent the unlawful

---

**32.** NFO estimated, as it turns out quite optimistically, that judgment would be rendered by 1980.

**33.** In addition, in 1977, the most recent figures available directly from the USDA were for 1975. The figures for 1976 are, therefore, based on information submitted monthly to the administrators of the relevant federal orders. Moreover, since, at the time of the damage calculation, figures were available for only the first eight months of 1977, the figures for that year are based on the twelve-month period ending August 31, 1977. In light of the Supreme

Court's admonition to observe the practical limits of proof in calculating the amount of antitrust damages, *see J. Truett Payne Co.*, 451 U.S. at 566, 101 S.Ct. at 1929, we hold that these figures are properly included in NFO's damage calculation.

**34.** For example, one reasonable approach would be to calculate the average yearly percentage decrease in the number of producers on the damage orders from 1970 to 1977 and use that figure as a basis for reducing NFO's membership dues claim.

conspiracy, but also for the milk that it actually did market during the two and one-third year period.

In calculating the former volumes—the milk it would have marketed but for the restrictive practices—NFO relied on the same figures it used in calculating its basic checkoff losses (the three cent per hundredweight checkoff). This volume totaled 77,438,179 hundredweight. *See* NFO Trial Exhibit No. 1040.

In computing the volume of milk actually marketed, NFO used its own figures for the years 1972–74.[35] This volume totaled 54,214,592 hundredweight. *See Id.*

NFO then multiplied the additional and actual volumes by the hypothetical two cent bargaining expense checkoff fee. This was done consistent with NFO's contention that, absent the appellees' unlawful conspiracy, the two cent checkoff would have been imposed at the beginning of 1972 instead of after one-third of 1974.

Thereafter, until 1976, the two cent checkoff applied only to the additional volume of milk NFO would have marketed but for the restrictive practices, reflecting the fact that NFO actually imposed the two cent checkoff in 1974. During 1976, NFO actually raised the bargaining expense checkoff fee to six cents per hundredweight. Reflecting the fact that the 1976 increase did not occur at the beginning of the year, NFO converted the 1976 checkoff fee to an annual figure of 5.7 cents per hundredweight.[36] Finally, from 1977 to 1980, NFO used the full six cent per hun-

dredweight figure, reflecting the assumption of static market conditions after 1977. *See* NFO Trial Exhibit No. 1005.

As a final step, after multiplying the actual and estimated volumes by the relevant checkoff fees, NFO deducted any additional expenses associated with obtaining and marketing the additional volumes.[37] Using this method, NFO estimated bargaining expense losses of $2,394,605. *See* NFO Trial Exhibit Nos. 1040, 1041.[38]

The appellees challenge as unsupported by the record NFO's contention that, but for the unlawful conspiracy, it would have imposed the additional two cent checkoff two and one-third years earlier than it actually did. NFO, on the other hand, cites the testimony of Gene Potter, an administrative coordinator with NFO in support of its contention. The testimony indicates that NFO waited until 1974 to impose the two cent checkoff because the growth of the dairy marketing program was slower than had been anticipated. *See* Trial Transcript at 7985.

While it is clear that a failure to grow may serve as the basis for an antitrust damage award, *see, e.g., T.V. Signal Co. of Aberdeen*, 617 F.2d 1302, 1308 (8th Cir. 1980) (allowing antitrust damages for sales that would have been made as the result of natural business expansion), in this case Potter's testimony simply lacks sufficient information to form the basis of the award NFO claims. Specifically, the testimony does not indicate the earlier time at which NFO would have instituted the checkoff

---

**35.** Since the checkoff was actually imposed after approximately one-third of 1974 had passed, NFO applied the two cent checkoff fee to one-third of its total actual volume for that year.

**36.** The 5.7 cent figure accounts for the fact that NFO did not raise the checkoff fee from two to six cents until one month of 1976 had passed.

**37.** Such expenses included such items as salaries, taxes, insurance and travel. *See* NFO Trial Exhibit Nos. 1003, 1004. As we have previously noted, *supra* at 1298, although the expenses are deducted from the bargaining expense checkoff claim, they are incurred in handling the additional volume of milk that achievement of a 10.5% market share entails. Accordingly, on remand, the district court should be certain that

the expenses are deducted whether or not the bargaining expense claim is allowed.

**38.** As an example of the lost bargaining expense calculation: using the year 1973, NFO actually marketed 24,810,366 hundredweight of milk, and using the 10.5% yardstick measurement calculates that it would have marketed an additional 10,939,142 hundredweight of milk. NFO's expenses associated with the additional volume were estimated at $182,172. Multiplying the volumes by the two cent per hundredweight checkoff NFO contends it would have imposed during the entire year, absent the restraints, NFO determined that it would have received an additional $532,818 in checkoff fees ((24,810,-366 + 10,939,142) × .02 − 182,172). *See* NFO Trial Exhibit 1040.

nor does it indicate that the additional checkoff would have been two cents had it been imposed at an earlier time. In short, apart from a generalized allegation of slower than anticipated growth, the record is devoid of evidence supporting NFO's contention in this regard. Thus, the contention may not properly form the basis for damages arising out of the hypothetical two cent checkoff fee NFO claims it would have imposed in 1972.[39]

With respect to NFO's other bargaining expense checkoff claims, the record reflects that it actually imposed a two cent per hundredweight checkoff in 1974 and increased that checkoff fee to six cents in 1976. We can discern no reason from the record why this additional checkoff should not be recoverable on the additional volume of milk NFO claims it would have marketed but for the unlawful conspiracy.

### 2. Post Relief Damages

■ A final element in NFO's damage claim is for the post-judgment period it would require to regain the market position it would have occupied but for the unlawful conspiracy. In calculating such damages, NFO assumed that relief would be granted in 1980 and that it would regain one-third of its mature share in each of the succeeding two years.[40] If, during the two-year period, the 1980 share plus the regained share exceeded the estimated share, no damages were claimed.[41] See NFO Trial Exhibit Nos. 1021, 1038.

Appellees challenge NFO's post relief damage claim as unsupported by the record. In assessing the claim, it is important to note that it is based on the same assumption that this Court did not completely accept with respect to NFO's post

computation claim—that conditions on the orders would remain essentially static after 1977. See supra at 1303–1305. The 1980 figures, which served as the base from which one-third of the mature share was gained, necessarily involve the same assumptions as the post computation claim because they are actually 1977 figures which NFO assumed would remain unchanged through 1980. See id; see also, Trial Transcript at 9667.

The post relief claim is, however, more suspect than the post computation claim for a number of reasons. First, because it is dependent entirely on post computation figures, any error in those figures will necessarily be carried forward and compounded in the post relief figures. Second, the unlawful acts in furtherance of the illegal conspiracy occurred well before 1980. Thus, the post relief claim arises out of a time period even more distant from the unlawful conduct cited by this Court. Accordingly, NFO's post relief claim is not properly included as an element of its damages.[42]

### F. Adjustment to Reflect Lawful Competition

Appellees finally contend that NFO's damage theory is defective because it fails to account for the effect on NFO of *lawful* competition. In support of their contention, appellees cite *MCI Communications v. American Telephone & Telegraph Co.*, 708 F.2d 1081 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). In that case, MCI filed an antitrust action against AT & T containing four counts and alleging twenty-two types of unlawful acts. At the close of MCI's case

---

**39.** According to our calculations, rejection of this portion of NFO's lost bargaining expense claim reduces its allowable damage claim by some $1,604,098.

**40.** This assumption is similar to and consistent with the assumption that NFO would have achieved its mature (10.5%) share on each order in three years with one-third of the mature share being achieved in each year. *See supra* at 1302.

**41.** At trial, NFO's damage expert assumed that judgment would be entered on January 1, 1980,

and reduced the 1981 and 1982 damage claims to present value using a discount rate of 6.5%. On remand, since it was apparent that a judgment in the case would not be rendered until at least 1983, NFO deleted that portion of its damage claim. *See* NFO Brief in Support of Damages, Appendix A at 8.

**42.** According to our calculations, rejection of NFO's post relief damages reduces its allowable damage claim by some $764,618.

in chief, the district court directed a verdict in favor of AT & T on seven of the twenty-two alleged unlawful acts. The remaining fifteen were submitted to the jury.

As part of its proof at trial, MCI submitted damage evidence consisting of a lost profits study purportedly comparing the revenues it actually received or would receive with the revenues it expected to receive if it had been "undamaged." The figures for the "undamaged" MCI were derived from original business plans for the company.[43] After adjusting for taxes, MCI claimed damages in the amount of $900,000,000.

The jury found in favor of MCI on ten of the fifteen alleged unlawful acts and awarded $600,000,000 in damages. The trial court trebled the award to $1,800,000,-000. On appeal, the Seventh Circuit reversed with respect to three of the ten alleged unlawful acts on which the jury had ruled in favor of MCI.

Considering the sufficiency of the damage evidence, the Seventh Circuit remanded for a recalculation of MCI's damages because MCI's damage proof improperly attributed all of its losses to AT & T's illegal acts. In other words, the Court rejected MCI's damage computation because it did not "establish any variation in the outcome depending on which acts of AT & T were held to be legal and which illegal." *MCI Communications*, 708 F.2d at 1163.

Building upon *MCI*, the appellees argue that NFO's damage claim must be *completely rejected* because it was not adjusted on remand to reflect the fact that certain alleged unlawful acts were later found to be lawful.[44] Such a position is at odds with the action of the MCI Court and cannot be accepted. While the damage award may have to be reduced so as to reflect

only the damages caused by the unlawful conspiracy, it cannot be eliminated entirely.

At base, an antitrust plaintiff's damages should reflect the difference between its performance in a hypothetical market free of all antitrust violations and its actual performance in the market infected by the anticompetitive conduct. *See Bigelow*, 327 U.S. at 264, 66 S.Ct. at 579 (approving of comparison of profits and values affected by the conspiracy "with what they would have been in its absence under freely competitive conditions"); *Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985) ("In economic terms, the amount of damages is the difference between what the plaintiff could have made in a hypothetical free economic market and what the plaintiff actually made in spite of the anticompetitive activities."). *Cf. Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d 381, 394–95 (8th Cir.1987) (rejecting damage theory because it assumed that plaintiff would have received the benefit of alleged price discrimination).

Thus, if a plaintiff's business or property is diminished as a result of a competitor's lawful acts, no antitrust damages are recoverable for those acts. *See MCI Communications*, 708 F.2d at 1161. That is not to say, however, that a plaintiff's failure to prove with precision the amount by which the award should be reduced to reflect lawful competition will be fatal to its claim. Such a rule would ignore the Supreme Court's repeated recognition that, once the fact of injury is established, the plaintiff need only present evidence as to the amount of its damages sufficient to allow the finder of fact to make a just and reasonable estimate not based on specula-

---

**43.** The study was written by MCI's former controller. The revenues projected for the "undamaged" MCI were based upon projections for the years 1973–84 made in 1971–72 which were primarily to be used for financing purposes.

**44.** Specifically, they argue that our prior opinion establishes the legality of certain mergers and acquisitions of independent cooperatives, of the practice of pool loading, of certain litigation brought directly against NFO and of attempts to

block NFO's qualification to pool milk on various market orders. *See NFO III*, 614 F.Supp. at 768. In addition, they argue that other claims brought by NFO were rejected by the district court at the original trial, which rejection was left undisturbed by this Court. Among these were: claims related to full supply contracts, base plans, retroactive competitive credits, and predatory acts against fourteen handlers of milk. *See id.*

tion or guesswork. *See, e.g., J. Truett Payne Co.*, 451 U.S. at 566–67 n. 5, 101 S.Ct. at 1930 n. 5 (citing *Story Parchment Co.*, 282 U.S. at 562, 51 S.Ct. at 250).

 An antitrust plaintiff's damage claim is not, as the appellees suggest, rendered speculative or unreasonable merely because it fails to provide for a specific reduction in the event that allegations of certain unlawful conduct are rejected. In other words, if an antitrust plaintiff alleges that the defendant engaged in unlawful acts A, B, C, and D, and acts C and D are later rejected as a basis of liability, it does not automatically follow that the damage award must be reduced. Rather, if acts A and B support the entire damage award, it must be sustained.[45]

Since the determination whether the unlawful acts can support the damage claim is largely a factual one, we must remand the case to the district court. On remand, the court shall afford the parties an opportunity to point out evidence *in the existing record* from which it may determine whether NFO's damage claim approved of herein should be reduced and, if so, the amount of such reduction. In considering such a reduction, we offer several guidelines to the district court.

First, in our prior opinion, we stressed the Supreme Court's admonition in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962), to avoid tightly compartmentalizing the plaintiff's proof. *NFO II*, 687 F.2d at 1193–94, 1208. We recognized that some of the appellees' conduct, if viewed in isolation, was lawful, yet formed part of the mosaic that constituted the unlawful conspiracy. *See NFO II*, 687 F.2d at 1193.

Separating the consequences of the unlawful from the consequences of the lawful will most certainly prove difficult. As the Supreme Court has stated, "[t]he vagaries of the marketplace usually deny us sure knowledge of what the plaintiff's situation might have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co.*, 451 U.S. at 566, 101 S.Ct. at 1929.

 Yet, the fact that the appellees' illegal conspiracy was composed of lawful and unlawful conduct so tightly intertwined as to make it difficult to determine which portion of the damages claimed were caused by the unlawful conduct should not diminish the recovery. Similarly, the Court should recognize that the harmful consequences of certain unlawful conduct may have been exacerbated by otherwise lawful conduct. In such a situation, the fact that lawful conduct contributed to additional injury should not prohibit recovery for that injury.

 Second, this case presents a situation in which one of the defendants, AMPI, ordered the destruction of documents allegedly relevant to this case. The destruction was characterized as involving "admitted bonfires." *NFO II*, 687 F.2d at 1205. In our prior opinion we stated:

We can only describe AMPI's conduct as outrageous. Obviously, the relevance of and resulting prejudice from destruction of documents cannot be clearly ascertained because the documents no longer exist. Under the circumstances, AMPI can hardly assert any presumption of irrelevance as to the destroyed documents. On this record, the district court properly could have imposed the most severe sanctions upon AMPI—dismissal of its claims and default judgment against it on NFO's claim. Nonetheless, we cannot say it was an abuse of discretion not to do so. It was error, however, not to draw factual inferences adverse to AMPI on matters undertaken in or

---

**45.** Indeed, in *Agrashell, Inc. v. Hammons Products, Co.*, 479 F.2d 269 (8th Cir.1973), this Court addressed a challenge to a jury award in favor of an antitrust plaintiff. In assessing the sufficiency of the plaintiff's damage evidence, the Court noted that the damage claim was based on the assumption that the defendant engaged in four types of unlawful conduct, one of which had been rejected by the district court and another of which was rejected by the Court on appeal. Nonetheless, the Court upheld the portion of the award based on the damage estimate, citing the policy that a violator of the antitrust laws should not profit from its wrongs.

through offices and individuals involved in the destruction of documents.

*Id.* at 1205–06 (citations omitted).

Therefore, the fact that AMPI may have engaged in conduct in addition to the antitrust conspiracy outlined in our prior opinion which made proof of the amount of damage more difficult must be considered on remand.

Third, review of the record and our prior opinion establishing the fact of injury leave this Court with the definite and firm conviction that the amount of damages suffered by NFO as a result of the illegal conspiracy was substantial. The record simply will not support a finding that NFO is entitled to only nominal damages. In short, the appellees must not be allowed to "clip NFO's wings and then escape liability on the grounds that NFO cannot fly." *Id.* at 1210.

Finally, we emphasize that, in assessing the evidence as to the amount of damage, precision is not required. Rather, the district court must weigh the existing record evidence and arrive at a just and reasonable figure. We realize the task the district court is called upon to perform is not easy and is made all the more difficult by the formidable record in the case. Nonetheless, it is one that must be undertaken, lest the appellees be allowed to profit from what can only be characterized as a broad conspiracy undertaken in blatant disregard of the antitrust laws.

### III. Injunctive Relief

In addition to the damage issues, we remanded for consideration of injunctive relief. On remand, the district court was to consider, inter alia, the extent to which consent decrees obtained by the United States in actions against Mid–Am and AMPI already provided NFO with sufficient relief.[46]

On remand, the appellees argued that injunctive relief is inappropriate because there is no evidence of any impending violation of the antitrust laws, and the injunction proposed by NFO merely duplicates sufficient relief already provided by consent decrees explicitly covering Mid–Am and AMPI and implicitly covering CMPC.

NFO responded that the consent decrees do not provide sufficient relief and, in any event, are not binding on CMPC. In particular, NFO argued that the decrees do not contain adequate enforcement mechanisms and that it is entitled to restorative injunctive relief designed to place it in the competitive position it would have enjoyed absent the illegal conspiracy.

The district court, with one exception, denied NFO's proposed injunctive relief as unwarranted and duplicative of the Mid–Am and AMPI consent decrees. The exception had to do with a proposed prohibition of sham litigation. With respect to sham litigation, the district court entered an injunction, despite the fact that it was satisfied the consent decrees were broad enough to cover sham litigation. It did so because the issue had never actually been decided and our prior opinion placed great emphasis on violations involving sham litigation. *See* 614 F.Supp. at 801–02.

Under the Clayton Act, 15 U.S.C. § 26, the district court has the duty and broad authority to fashion relief that will terminate the unlawful acts found to have occurred, ensure that they will not recur, and eliminate their consequences. *Paschall v. Kansas City Star Co.*, 695 F.2d 322, 335 (8th Cir.1982), *rev'd on other grounds*, 727 F.2d 692 (1984) (en banc) (quoting *National Society of Professional Engineers v. United States*, 435 U.S. 679, 697, 98 S.Ct. 1355, 1368, 55 L.Ed.2d 637 (1978); *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 250, 88 S.Ct. 1496, 1500, 20 L.Ed.2d 562 (1968)); *see also United States v. Glaxo Group Limited*, 410 U.S. 52, 64, 93

---

**46.** We stated:
 The only other question relates to injunctive relief and the possible mootness effect of the Mid–Am and AMPI consent decrees. NFO is plainly entitled to an injunction against the kind of unlawful conduct identified here.

The district court is, of course, free to consider the extent to which the consent decrees provide NFO with sufficient, enforceable relief.

*NFO II,* 687 at 1210.

S.Ct. 861, 868, 35 L.Ed.2d 104 (1973) ("The purpose of relief in an antitrust case is 'so far as practicable [to] cure the ill effects of the illegal conduct, and assure the public freedom from its continuance.'"). In carrying out its duty, the district court has "large discretion to model [its] judgment to fit the exigencies of the particular case." *Paschall*, 695 F.2d at 335 (quoting *International Salt Co. v. United States*, 332 U.S. 392, 400–01, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947)).

■■■ On appeal, NFO claims that it is entitled to injunctive relief even though the conduct complained of may be prohibited by the consent decrees. We disagree. Our prior opinion clearly recognized that NFO is not entitled to injunctive relief to the extent other existing relief is adequate. *See NFO II*, 687 F.2d at 1210, n. 38, 39. We have carefully reviewed the AMPI and Mid–Am consent decrees and have compared them with the injunction proposed by NFO. We conclude that, with the exception of the prohibition against sham litigation noted by the district court, they offer NFO substantially the same relief. In short, provided the provisions of the consent decrees can be reasonably enforced by NFO, there is nothing to be gained by entering an injunction that substantially duplicates the relief already available. *Cf. Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972) ("While the United States Government, the governments of each State, and any individual threatened with injury by an antitrust violation may all sue for injunctive relief against violations of the antitrust laws, and while they may theoretically do so simultaneously against the same persons for the same violations, the fact is that one injunction is as effective as 100, and concomitantly, that 100 injunctions are no more effective than one.").

Alternatively, NFO contends that the enforcement mechanisms in the consent decrees are inadequate to afford it meaningful relief. Pursuant to the consent decrees, NFO may bring an enforcement action by filing a request with the Assistant United States Attorney General in charge of the Antitrust Division and the district court alleging noncompliance, the injury resulting therefrom, and the relief requested. The Assistant Attorney General then has twenty days to respond. A copy of the response must be sent to NFO and to the district court. If NFO is not satisfied with the government's response, it may petition the court to exercise its independent jurisdiction and to direct enforcement proceedings on its own motion. *See United States v. Associated Milk Producers, Inc.*, 394 F.Supp. 29, 57–58 (W.D.Mo.1975); *United States v. Mid–Am*, 1977 Trade Cases 61,-508. Although the enforcement provision places an administrative burden on NFO and may involve a small delay, in view of the fact that the decrees clearly contemplate full and complete private enforcement, we cannot say that the district court erred in finding that the consent decrees offered NFO adequate relief.

NFO also claims that the consent decrees are inadequate because they are not binding on CMPC. The district court rejected this claim as "untenable." *NFO III*, 614 F.Supp. at 801. CMPC is a federation of cooperatives of which AMPI is a member and the sole marketing agent. The consent decree entered against AMPI is binding on "all persons in active concert or participation" with AMPI.[47] *United States v. Associated Milk Producers, Inc.*, 394 F.Supp. at 50. Accordingly, we affirm the district court in this regard.

Finally, NFO contends it is entitled to the restorative relief. The proposed relief consisted of five parts. Part one required the appellees, for a period of one year, to allow their members to terminate marketing agreements at any time on thirty days notice in order to join NFO. Part two required Mid–Am and AMPI to purchase milk from NFO under certain specified terms and conditions for a period of five years. Pursuant to part three, if the appellees acquired a milk receiving or processing plant which bought milk from NFO during the twelve months preceding the acquisition, they would be required to purchase

---

**47.** In addition, paragraph XIII of the AMPI consent decree required it to furnish a copy of the decree to CMPC; thus, there is no question that CMPC has actual notice of the decree. *See United States v. Associated Milk Producers, Inc.*, 394 F.Supp. at 55.

the same volume of milk NFO sold the plant in the preceding twelve months at the same price and terms as other milk received at the plant. Part four required CMPC to allow NFO to participate in its dairy surplus disposal program for the next five years under the same terms and conditions as other CMPC members. Part five prohibited the appellees from block voting their members' stock if the effect would be to terminate or amend any existing federal market order. NFO Proposed Injunction, Brief of Appellant, Addendum II, part p. at 7–10.

The district court carefully considered NFO's proposed restorative relief and found it unwarranted, duplicative, or inappropriate. We agree and affirm the district court's rejection of the requested restorative relief.

## IV. Denial of Class Certification

In addition to the appeal brought by NFO, nine individual NFO members appeal the district court's refusal to certify a class of NFO member dairy farmers seeking to recover damages.

Shortly after this case was filed, it became apparent that issues concerning class certification would play an important role. As early as June of 1971, issues involving requests by both NFO and Mid–Am to certify a class of their respective members were discussed. Subsequently, the district court expressed to the parties on numerous occasions its view that other devices superior to a class action were available and that it was not inclined to grant the class certification motions. Accordingly, the district court requested the parties to try to reach an agreement on alternative methods for resolving standing and damage distribution issues. Attempts to reach such an agreement failed, however, and at a pretrial con-

ference in 1974, the district court denied NFO's request for class certification "without prejudice to later suggestions as to [the resolution of] the problems of distribution of damage." Transcript of Pretrial Conf. No. 20 at 31.[48]

After additional discussion, NFO moved the district court to reconsider the denial or, in the alternative, to certify the issue for interlocutory review pursuant to 28 U.S.C. § 1292(b). The district court denied the motion.[49] On January 21, 1981, the district court entered a final judgment in phase II of the case (involving NFO's counterclaim). At that time, no further motion with respect to class certification had been raised. The judgment stated, "It is Ordered and Adjudged that the plaintiff, The National Farmers Organization, Inc., take nothing and that this action be dismissed on the merits." *Alexander v. National Farmers' Organization* (W.D.Mo.1981).

NFO thereafter appealed to this Court from the judgment. Neither the individual class members nor the putative class appealed either the judgment or the previous denial of class certification. On appeal, this Court examined the standing and damage issues and held that NFO could not recover damages resulting from the lower price it received for its milk. Instead, we held that such damages could be recovered only by the individual NFO members. *NFO II*, 687 F.2d at 1209.

■ On remand, the individual NFO members again brought a motion to certify a class. The district court denied the motion, finding that NFO made a deliberate election to claim the price reduction damages as belonging to it and not to the class and that the failure to appeal the district court's original interlocutory order and judgment barred consideration of the class

---

**48.** Also at Pretrial Conference No. 20, Mid–Am sought and was granted leave to file a fifth amended complaint which did not seek recovery for any of its proposed class claims. Transcript of Pretrial Conf. No. 20 at 7–8.

**49.** The status of NFO's class certification motion is most clearly ascertainable from a March 8, 1974, Pretrial Order which states:

Any motion of NFO counterclaimants, including that filed February 1, 1974, for certification of a class consisting of NFO dairy

farmers is hereby denied, without prejudice to the rights of any party to file subsequent motions, including a class action motion, with respect to the manner of processing claims which may be involved in this litigation. It may be refiled at any time. All other motions seeking a determination of certification of the class action have been withdrawn, and no request by any other party for a class action now pends before this Court.

certification issue. Alternatively, the district court held that class certification would be improper because individual factual and legal issues concerning the amount and fact of damage predominated.

We agree with the district court that consideration of the class certification motion is barred. In *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981), the Supreme Court addressed a situation in which two parties failed to join in a direct appeal from an adverse judgment and, in a later collateral proceeding, sought to take advantage of a reversal obtained by the appealing parties. The Court ruled against the non-appealing parties, holding that a final judgment on the merits, even if wrong or based on a subsequently overruled legal principle, precludes the parties or their privies from relitigating issues that were or could have been raised in the original action. *Id.* at 398–99, 101 S.Ct. at 2427–28.

The putative NFO class argues that *Moitie* is not applicable to this case because the 1981 judgment, by its terms, was entered against NFO and not against the class. We disagree. The fact that the 1981 judgment did not specifically run against the class claimants did not preclude their appeal from it. In *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977), the Supreme Court addressed a situation in which a United Airlines flight attendant attempted to bring a class action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, challenging a rule requiring female flight attendants to remain unmarried as a condition of employment. The district court denied class certification, finding that the class could properly consist of only those attendants who, upon discharge for marriage, had filed claims under a fair employment statute or grievances pursuant to United's collective bargaining agreement. Thus, because the class so limited contained only thirty members, the district court refused certification on the ground that the class was not sufficiently numerous to render joinder of all members impracticable. The case then proceeded to a judgment in favor of the individual plaintiffs.

After entry of the judgment, McDonald, a member of the flight attendant class, as originally defined, who failed to challenge her discharge either to the EEOC or under the collective bargaining agreement, sought leave to appeal the denial of class certification despite the fact that individual plaintiffs had decided not to appeal. The district court denied the request as untimely. The Court of Appeals reversed, finding both that the request was timely and that the district court erred in narrowly defining the class. United appealed only the timeliness issue. The Supreme Court affirmed, finding that, "the entry of final judgment made the adverse class determination appealable." *Id.* at 394, 97 S.Ct. at 2469–70.

The basic premise of *McDonald*—that a member of a class denied certification may appeal that denial upon entry of a final judgment in the case in which certification was denied—is directly applicable to this case. As in *McDonald*, the NFO class claimants were free to appeal the adverse class certification ruling, as well as any other rulings of the district court, once final judgment was entered on NFO's claims. Their failure to do so is preclusive.

To hold otherwise defies common sense. It would only be redundant for the district court to enter a final judgment against the class after it had already refused to recognize it. Moreover, since the claims of the class and of NFO arise out of many of the same operative facts and require application of the same laws, considerations of judicial economy and consistency argue strongly in favor of requiring the appeals of the class and of NFO to be heard at the same time. Accordingly, we affirm the district court's refusal to certify a class of NFO dairy farmer members.

## V. Attorney's Fees and Costs

The antitrust laws provide that a plaintiff who recovers damages or who "substantially prevails" in an action for an injunction shall recover the costs of suit and a reasonable attorney's fee. 15 U.S.C. §§ 15 and 26. Mindful of the admonition in *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), to avoid a "second major litigation," the

district court denied, without prejudice, NFO's motion for attorney's fees and costs pending appeal to this Court.[50]

Specifically, the district court noted that under the standards set forth in *Hensley* and in this Court's application of *Hensley* in *Williams v. Mensey*, 785 F.2d 631 (8th Cir.1986), it must award attorney's fees in an amount that is reasonable in relation to the results obtained. *Alexander v. National Farmers' Organization*, 637 F.Supp. 1487, 1499–1500 (W.D.Mo.1986). In this regard, the district court stated:

[A]ny attorney's fee award that this Court may make at this time, would necessarily have to be based on the results that NFO has up to this point obtained in the district court. Any award of attorney fees that would be based on judgments that are subject to immediate appellate review would be nothing more than an exercise in futility unless it is assumed that this Court will eventually be affirmed on the judgments that will be entered on both the damage issue and equitable relief issue. Based on its experience with the parties, the Court is confident that the parties will not be in agreement that such an assumption should be made. We are accordingly satisfied that the extent of NFO's success or lack of success should be finally determined on appeal before this Court embarks on what promises to be a second major litigation in connection with NFO's request for an attorney's fee award.

*Id.* at 1500.

Thus, rather than undertaking the time-consuming task of determining a reasonable attorney's fee, only to see the effort overturned on appeal, *see, e.g., Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (overturning entire attorney's fee

award); *Paschall v. Kansas City Star Co.*, 727 F.2d 692 (8th Cir.1984) (en banc) (same), the district court wisely deferred ruling on attorney's fees and costs pending appeal.

In light of our decision herein finding that NFO is entitled to a substantial damage award in addition to the injunctive relief obtained in the district court, it is clear that the time has now come for the district court to address the question of attorney's fees and costs. Accordingly, we remand to the district court with directions to it to determine the amount NFO should be awarded for reasonable attorney's fees and costs it incurred in the district court.[51]

Finally, in accordance with our prior opinion in this matter, *see Alexander v. National Farmers' Organization, Inc.*, 696 F.2d 1210 (8th Cir.1982), NFO may move this Court for an award of expenses incurred in pursuing this appeal. Such expenses may include attorney's fees, court costs, and other miscellaneous costs.

## VI. Conclusion

In summary, from our prior opinion and the record in this case it is clear that NFO has established that the appellees engaged in a broad conspiracy in violation of the antitrust laws and that the conspiracy caused it a substantial amount of damage. Accordingly, we remand to the district court for computation of the amount of damages. In computing that amount, the district court shall accept the "test market" theory propounded by NFO as a valid base from which to determine the amount of damages and shall use the $7,403,374 claimed under the theory as a starting point.

In accordance with this opinion, that figure shall be reduced by $1,604,098, reflecting our rejection of NFO's claim that it

---

**50.** The attorney's fee dispute will be substantial. The district court noted that, "NFO submitted a proposed order for an $18,280,668.50 award of attorneys' fees. That award is based on 75,379.-64 partner hours, 44,401.99 associate hours, and 33,672.93 law clerk and paralegal hours." *Alexander v. National Farmers' Organization*, 637 F.Supp. 1497 n. 22 (W.D.Mo.1986).

**51.** NFO also appeals from the district court's finding that NFO was only entitled to interest

on this Court's award of attorney's fees and costs incurred in bringing the initial appeal at a rate of 8.72% commencing on May 31, 1983. NFO contends that interest should properly accrue at a rate of 12.4% from August 31, 1982, the date this Court entered judgment for the fee award. Having carefully considered NFO's arguments, we affirm the district court in this regard.

would have imposed a two cent bargaining expense checkoff fee in 1972, rather than in 1974, and by $764,618, reflecting disallowance of post relief damages. In addition, the district court shall make certain the damage award reflects the expenses associated with handling the additional volume of milk NFO would have marketed had it achieved the 10.5% test market share.[52]

The district court may also, in its discretion, further reduce the damage award to reflect the following:

(1) the voluntary checkoff fee contributions of NFO members pooling milk on the damage orders through milk marketers other than NFO;

(2) an appropriate reduction of NFO's post order combination and post computation membership dues claim due to an overall decrease in the number of producers; and

(3) an adjustment, if any is necessary, for the effects of alleged unlawful conduct later found to be lawful.

In considering the discretionary reductions, the district court shall keep in mind the admonition in the Supreme Court opinions and in this opinion that NFO need not prove its damages with unnecessary precision. Rather, the damages awarded need only be just and reasonable in light of the practical limits of proof in a case of this nature. Finally, once the district court has determined a just and reasonable award, that amount shall be trebled in accordance with section 4 of the Clayton Act, 15 U.S.C. § 15.

We also deny NFO's requests for additional injunctive relief and to certify a class of its dairy farmer members. We remand to the district court for a determination and award of a reasonable attorney's fee and costs. NFO may make application to this Court for any attorney's fees and costs it reasonably incurred in pursuing this appeal.

Accordingly, the judgment of the district court is affirmed in part, reversed in part, and remanded to the district court for further proceedings consistent with this opinion.

---

**52.** The reduction should be ascertainable from the existing record. Along these lines, we note that for the years 1970–77, NFO has deducted such expenses from its bargaining expense checkoff claim. We have, however, held that such expenses are attributable to the additional volume serving as the basis of both the three cent checkoff and the bargaining expense checkoff. Therefore, the expenses must be deducted for the 1972–74 period, even though we have rejected the claim that, absent the illegal conspiracy, NFO would have instituted a two cent bargaining expense checkoff. In addition, we have been unable to locate in the record an estimate of the expenses NFO would have incurred in marketing the mature volume of milk in the years 1978–80. On remand, the district court shall determine the amount of such expenses and reduce the award accordingly.